

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **STEPHEN CHARLES DOUGLASS** | § | |
| xxx-xx-7094 | § | Case No. 13-42079 |
| **and KIMBERLY ANN DOUGLASS** | § | |
| xxx-xx-3739 | § | |
| | § | |
| Debtors | § | Chapter 7 |

| | | |
|---|---|---|
| SONIA I. DOUGLASS | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 13-4106 |
| | § | |
| STEPHEN CHARLES DOUGLASS | § | |
| and KIMBERLY ANN DOUGLASS | § | |
| | § | |
| Defendants | § | |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Upon trial of the complaint filed by the Plaintiff, Sonia Douglass, seeking a

determination of the existence and the alleged nondischargeable nature of a debt

purportedly owed to her by the Defendant-Debtors, Stephen Douglass and Kimberly

Douglass (collectively, the "Defendants" or "Debtors"), as well as upon consideration of

a related objection of the Plaintiff to the Defendant-Debtors' First Amended Claim of

Exemptions filed in the underlying bankruptcy case, the Court issues the following

findings of fact and conclusions of law.  The Plaintiff contends that her assertions of

causes of action against the Defendants should not be subject to any limitations defense

otherwise applicable to such claims, that any liability arising from such claims is a

nondischargeable debt pursuant to 11 U.S.C. § 523(a)(4),[1] and that she is entitled to other

equitable remedies, including the imposition of a constructive trust placed on the

Defendant-Debtors' claimed homestead in Argyle, Texas. Because she claims an

equitable title in the Debtors' Argyle homestead, the Plaintiff also objected to the

Defendant-Debtors' claim of homestead exemption to that Argyle property and to certain

exemption claims relating to personal property in the main bankruptcy case. Such

objection was reassigned to the undersigned judge to be tried in conjunction with the

dischargeability adversary. Following the trial and upon completion of the parties'

opportunity to submit post-trial briefs, the Court took the matter under advisement. This

decision disposes of all issues pending before the Court.

## FINDINGS OF FACT

1.    The Defendants, Stephen Charles Douglass ("Stephen")[2] and Kimberly A.
Douglass ("Kimberly") (collectively, the "Defendants") filed a joint petition for
relief under Chapter 7 of the United States Bankruptcy Code on August 28, 2013.

2.    The Plaintiff, Sonia Douglass ("Sonia"), is Stephen's 86-year-old mother and the
mother-in-law of Kimberly.[3]

---

[1]   An accompanying count under 11 U.S.C. §523(a)(2)(A) was dismissed with prejudice on
March 26, 2014 [dkt #10] upon the motion of the Defendants.

[2]   In an effort to avoid confusion over the common surname, the Court will reference the parties
by their given names and apologizes for the necessity of this informality.

[3]   Sonia and Dan Douglass also had two older daughters, Kathryn and Teresa.

3.    Sonia timely filed her Original Complaint Seeking Affirmative Relief and the Determination of Non-Dischargeability of Debt on November 26, 2013, seeking to liquidate her claims against Stephen and Kimberly and a determination that any such claim should be excepted from the scope of any discharge granted to either of the Defendants pursuant to 11 U.S.C. §523(a)(2)(A) and §523(a)(4).

4.    Sonia was married to Dan Otto Douglass ("Mr. Douglass") for approximately 45 years.  Mr. Douglass handled virtually every aspect of the couple's financial affairs during their marriage.

5.    Stephen earned a college degree in banking and finance from the University of North Texas and began a career in the banking and financial services industry.

6.    Stephen worked at various local banks through the 1980s.  In 1989, he became employed by the Federal Reserve Bank of Dallas and served in various capacities from 1989 through 2011.  He was an experienced banking professional.

7.    It was in 1993 that Dan Douglass passed away, leaving his entire estate to his widow, Sonia.

8.    Mr. Douglass died testate and his will was tendered for independent probate administration in Kaufman County, Texas.[4]  Sonia was named as the executrix of her husband's estate.

9.    Attorney Tom M. Snow of Terrell served as the attorney for Sonia during the probate of her late husband's estate.

10.    The inventory and appraisement revealed the existence of two pieces of real estate, a lakehouse in Henderson County, Texas valued at $120,000, and a home in Rowlett, Texas, valued at $80,000.  It also revealed personal property valued at $306,491.29, which encompassed a number of financial accounts and certificates of deposit.[5]

11.    Sonia was initially active in the formation of new cash accounts.  For example, she opened a savings account ending in -3638 in April 1993, in her singular name at

---

[4]  Plaintiff's Ex. 60.

[5]  *Id.*

Bank One.  The mailing address for this account was Sonia's home in Rowlett.[6]

12.     Two months later, Sonia similarly opened account -5761 in her name at the same bank.[7]

13.     As time went by, however, Sonia increasingly felt ill-equipped to handle the investments alone because she had no real experience in managing financial assets or in determining the proper vehicles for the growth of such assets.

14.     From the time of her husband's death, Sonia was consistently generous to her family members, particularly those who lived closer to her, and she was motivated not only to preserve and expand the asset base for her own use, but she also wanted to maximize the amount available for those periodic contributions to her family.

15.     Sonia offered no pretense of knowledge regarding where her liquid assets should be invested in order to reach those goals and, due to her advancing age, she was reticent to travel outside her immediate area in order to facilitate those transfers.

16.     As a result, Sonia increasingly sought and obtained the advice and assistance of the experienced banker in her family — her son, Stephen.

17.     The only formal fiduciary relationship which Stephen undertook on behalf of his mother during the relevant time period was in 1996 when he was given a Special Durable Power of Attorney - Real Estate to effectuate the sale of his parents' lakehouse in Henderson County, Texas. [8]  That realty sale was completed in that year.

18.     Otherwise, Stephen had no formal power of attorney to handle any of his mother's financial affairs.[9]

---

[6]  Defendants' Ex. 2-M.

[7]  *Id.*

[8]  Plaintiff's Ex. 58.

[9]  Sonia did grant Stephen permission to participate in any telephonic discussions which she might have with the IRS, but Stephen had no formal power to act on her behalf.

19.    Notwithstanding the lack of formal authority, however, Stephen's active
       participation in the management of his mother's financial affairs increased
       incrementally from 1996 through December 2011.

20.    Stephen began to advise her regarding the establishment of new accounts or when
       amounts should be shifted to new institutions or new types of investment vehicles.

21.    Sonia increasingly deferred to Stephen with regard to the manner in which her
       funds were held due to her trust in his financial expertise.

22.    For example, three years after the death of her husband, Stephen was added to
       Chase account -5761.  However, rather than being added merely as an
       accommodation party with no ownership rights, the account was modified to list
       Stephen as a joint owner with rights of survivorship.[10]

23.    As an experienced banker, Stephen would have known the ownership
       ramifications of the selection of a joint account and the significance of granting a
       right of survivorship.

24.    Signature cards for multiple accounts indicate that (1) Stephen was added as a joint
       tenant to accounts already owned by Sonia, or (2) new accounts were opened with
       Sonia and Stephen listed as joint tenants.  Many, if not all, of these accounts which
       were subsequently opened also provided Stephen with rights of survivorship.[11]

25.    As time went by, Stephen's "restructuring" of his mother's cash accounts
       continued, providing him with ever-increasing access to the funds on deposit.

26.    In June 2001, funds were shifted from Bank One to Farmers & Merchants State
       Bank ("F&M") to establish a checking account and to purchase a $50,000
       Certificate of Deposit.[12]

27.    Both Sonia and Stephen were listed on the F&M bank account and the ownership
       status was listed as multiple-party with right of survivorship.  Sonia's address in

---

[10]  *Id.*

[11]  Defendants' Ex. 2-M & 2-O.

[12]  Defendants' Ex. 3-B.

Rowlett was the designated address on the account.[13]

28.    A similar multi-party account with right of survivorship [-6310] was opened at Jefferson Heritage Bank in June 2001.[14]

29.    Stephen became a listed account owner on the money market account at First Bank and Trust - Denton [account -4637] in September 2002.[15]

30.    Stephen wrote several checks on the First Bank and Trust - Denton account [-4637] during that year, totaling more than $11,500.[16]

31.    Similar shifts to joint ownership with some type of direct survivorship rights in Stephen included a Chase Bank CD in December 2005,[17] a Synergy Bank account [-4603] at least by October 2008,[18] a Chase POD-savings account [-3638] in late 2009,[19] a CD at First United Bank and Trust in 2010,[20] and a Synergy Bank account [-0720] in 2010.[21]

32.    All of these financial account "restructurings" were taken under Stephen's direction and influence.

33.    The financial alterations provided Stephen with ongoing access to his mother's

------

[13]    *Id.*

[14]    Defendants' Ex. 2-O.

[15]    Defendants' Ex. 3-Z & 4-I.

[16]    Check 1001 was written for $9,350.  Defendants' Ex. 3-Z. Check 1004 was written for $1,080. Defendants' Ex. 4-J. Check 1005 was written for $1,260.  Defendants' Ex. 4-I. Additional checks were written on the account, but were not introduced into evidence.

[17]    Defendants' Ex. 2-M.

[18]    Defendants' Ex. 4-K. Plaintiff's Ex. 34. This is the earliest piece of correspondence regarding the Synergy Bank account.   Its creation date is not revealed by the submitted evidence.

[19]    Defendants' Ex. 2-M.

[20]    Defendants' Ex. 2-Z.  Again, the actual creation date for this CD is not revealed by the submitted evidence.

[21]    Defendant's Exhibit P-2

money and to utilize those funds arbitrarily to meet whatever financial needs he might face.

34.    There were certainly transactions, such as certain gifts to particular family members, including extravagant gifts,[22] which were initiated by Sonia.

35.    Sonia acknowledged at trial that she at various times authorized Stephen to make withdrawals from designated accounts prior to the time that any withdrawal was made.

36.    However, Stephen's testimony that he never withdrew funds from the various accounts without his mother's prior approval is not credible and, as set forth *infra*, unilateral withdrawals by Stephen, with subsequent discovery by Sonia, became more frequent as time passed.

37.    It is certainly true that, with regard to those accounts, all of the transactions were discoverable by Sonia on a monthly basis based upon her systematic review of the respective bank statements and her journal entries triggered by that review.

38.    While she may have rarely complained or taken punitive measures about the way in which her funds were being handled, perhaps due to fears, real or imagined, that she would be isolated from his family if she challenged his activities, Sonia was attentive to the activity occurring within her financial accounts.

39.    For all of the relevant time periods, the bank statements regarding these various accounts and instruments were always tendered directly to Sonia at her residential address in Rowlett on a monthly basis.[23]

40.    Stephen's wife and co-Defendant, Kimberly, was not a signatory or stated owner on any of Sonia's accounts presented to the Court during the relevant time periods.[24]

---

[22]  These included cars for grandchildren, assistance with wedding and honeymoon expenses, furniture, and generous birthday and Christmas gifts.

[23]  The only account which apparently was not recharacterized was a First United Bank and Trust account [-0112].  The 1099-INT statements for that account lists only Sonia as the owner.  Defendants' Ex. 2-Z.

[24]  Defendants' Ex. 2-M & 2-O.

41.    Although Sonia increasingly relied upon Stephen to take whatever action he thought was necessary in order to maximize her financial holdings, she did not wholly relinquish financial control to Stephen.

42.    Though she did not maintain a checkbook or check register, and though she rarely attempted an actual reconciliation of the stated amounts, Sonia faithfully reviewed the contents of the monthly bank statements throughout the relevant time period.

43.    For years, Sonia also routinely utilized a handwritten journal to document, often in significant detail, the ongoing events in her life, including financial matters, appointments, contact information, birthdays, recipes, and other aspects of daily life.[25]

44.    As to her financial matters, Sonia generally tracked her income and expenses in her journal.  Among other transactions, she often noted various gifts that she had made, or that she had authorized to be made on her behalf, to family members.

45.    Most significantly, the journals document that, as she reviewed her bank statements on a monthly basis, Sonia often duplicated their contents verbatim into her journal or, at the least, noted the purpose of, or other details about, particular financial transactions, even if such review was done after-the-fact.[26]

46.    During all relevant time periods germane to this case, Stephen and Kimberley maintained two Chase Bank joint accounts: checking account [-2084] and checking account [-5159] (collectively, the "Defendants' Accounts").  As joint owners of these checking accounts, the Defendants each had access to the funds in those Accounts.

47.    Transfers of funds from Sonia's accounts to the Defendants' Accounts were initiated by Stephen through various means including:  (1) by an electronic transfer;[27] (2) by issuance of  a check drawn upon one of the accounts; or (3) by the use of "withdrawal slips" signed by Stephen and drawn upon Sonia's

---

[25]   Defendants' Ex. M.  Journal excerpts presented at trial dated back to 2003.

[26]   Defendants' Ex. T.

[27]   The parties did not explicitly address Stephen's access to Sonia's bank accounts through an online account. However, multiple transactions indicate the use of such online transfers.

accounts.[28]

48.    Though she may not have known in advance about certain financial actions taken by Stephen with regard to her finances, Sonia knew that she had granted Stephen direct access to her financial accounts and she was aware of those financial activities based upon her review of the bank statements which came directly to her.

49.    There is no evidence of any withdrawals by Stephen from Sonia's cash accounts which were concealed from Sonia.

50.    Sonia was capable of knowing, and in fact did know, of Stephen's activities with regard to her financial accounts, but she elected to take no action based upon several possible motivations, including a reasonable (though perhaps erroneous) expectation that he would care for her needs.

51.    Though Stephen's activities with regard to her financial accounts were known to her, Sonia deferred to Stephen's expertise and knowledge.

52.    In light of the fact that she had always exclusively relied upon her husband to tend to financial matters during their long marriage, Sonia felt vulnerable and unprepared for the responsibility to handle the significant financial resources that were thrust upon her after her husband's death.

53.    Sonia turned to her son for assistance and guidance due to her limited experience in financial matters, and she thereafter relied upon the superior financial expertise she believed her son possessed as an experienced banking professional.

54.    With advancing age and with limited mobility, Sonia relied not only upon Stephen's professional advice and expertise, but also upon his actual ability to implement any financial changes that he might have deemed advisable.

55.    In order to facilitate that reliance, Sonia entrusted Stephen to an even greater degree by acceding to his joint ownership of many of her financial accounts, thereby providing him with direct access to her funds.

---

[28]    Certain withdrawals and transfers were made by Stephen, but documentary evidence presented at trial did not specify which of these manners Stephen employed, or if an alternate transfer method was used.

56.   Stephen's direct access allowed him to invade Sonia's cash assets upon his sole initiative and eliminated the need to consult with her in advance.

57.   Given the totality of the circumstances, from 1996 through December 2011, Stephen had an informal fiduciary relationship to Sonia with regard to his access to, and his management of, her financial assets.

58.   Given the totality of the circumstances, from 1996 through December 2011, Stephen was required to place Sonia's interests above his own personal financial interests with regard to his access to, and his management of, her financial assets.

*Defendants' Homestead Acquisition*

59.   The first large transaction involving the use of Sonia's funds for Stephen's benefit occurred in 1997 when the Defendants sold their home near Sonia in Rowlett and bought a rural residence and 20 contiguous acres of real property located on Hilltop Road near Argyle, Texas.

60.   The Defendants purchased the Argyle property from Kimberly's parents for a net sales price of $330,000.00.

61.   The Defendants were able to purchase the Argyle property while incurring little indebtedness because they obtained a $250,000.00 gift from Sonia.  This gift was documented by a written (though unacknowledged) "Designation of Gift," drafted by Stephen, which stated:

> I, Sonia Douglass, being of sound mind and good health have this date, 4-4-97, designated and given a gift of $250 thousand to my son, Stephen Douglass.  It is my desire to give this gift to he and his wife, Kimberly (sic) to do with as they desire. Inasmuch as this is a gift, I am not expecting repayment or anything in return.  It is my intention that the giving of this gift will have no effect on the eventual settlement of my estate as specified in my expressed and written will.[29]

62.   The gift was made following discussions between Stephen and Sonia about the availability of the attractive Argyle property which both had seen at earlier events

---

[29]  Plaintiff's Ex. 59.  This Designation was admittedly drafted by Stephen, but he unpersuasively claims it was done at Sonia's instruction.

hosted by Kimberly's parents.

63.    Stephen did not inform his two sisters about this gift (particularly about the insertion that this would not affect any future inheritance for him), nor did he advise his mother to obtain independent legal or financial advice about the wisdom of this transaction from her financial perspective.

64.    However, the relationship between Sonia and Stephen at this time was close and both reasonably thought that he would become increasingly responsible for his mother's care in future years.

65.    Sonia claims that she expected that a cottage would eventually be built for her on the adjoining acreage in her advancing years for her care and comfort and so that she could maintain close relationships with Stephen's family.

66.    Though Stephen disputes that such a "cottage dream" was ever discussed at the time of the gift, he acknowledges that preliminary discussions and plans about that possibility were subsequently discussed from time to time.[30]

67.    Though Stephen undoubtedly sought to influence his mother to provide this money, the most reasonable inference from the evidence suggests that Sonia was also self-motivated to advance the money to Stephen in furtherance of her expectation that a nice "family compound" might be developed at some point in the future.

68.    Notwithstanding the scope of the complaint, the Court need not make evidentiary findings regarding the 1997 gift which facilitated the purchase of the Argyle property by the Defendants if the Plaintiff's cause of action is barred under the applicable statute of limitations.

*Transactions Prior to 2008*

69.    In addition to the $250,000 tendered to Stephen in 1997 for the acquisition of the Argyle property, Sonia seeks recovery of other sums of money transferred to, or otherwise appropriated by, Stephen going back to the mid-1990's.

70.    Sonia contends that the Court may properly examine financial transactions beyond

---

[30]   *See, e.g.*, Plaintiff's Ex. 6.

the four-year limitations period for breaches of fiduciary duty and other causes of action generally established by Texas law.

71.    Sonia alleges that she suffered from long-term, clinical depression as well as severe health issues, which rendered her mentally incapable of handling or understanding the finances that she inherited as a result of the death of her husband and which precluded her from taking any legal action to reverse the allegedly improper actions of her son.

72.    Yet the testimony from persons familiar with Sonia from the time of her husband's death through the 2000's casts considerable doubt upon her alleged mental frailties in the time period from 1993 to 2011.

73.    Thomas M. Snow served as the probate attorney for the administration of Dan Douglass' decedent's estate in 1993-94.

74.    Mr. Snow testified that he had absolutely no concerns at that time regarding Sonia's fitness to serve as the independent executrix of Dan's estate.

75.    Though he acknowledged that the probate did not involve complex estate matters, Mr. Snow confirmed that, had Sonia shown any signs of suffering from any mental deficiencies or lack of capacity, he would have never sought her appointment as the executrix, but he unequivocally stated that no such signs ever existed.

76.    Neil Satyu, M.D. also testified about the Plaintiff's physical and mental state from 2005-2011.

77.    Dr. Satyu was the Plaintiff's primary physician in Terrell, Texas during that time, prior to Sonia's relocation to Colorado.

78.    Dr. Satyu testified that in that time period he evaluated Sonia's condition every three to four months.

79.    Dr. Satyu addressed whatever medical conditions arose with Sonia during that time period.  That included physical problems with blood pressure and arthritis, and he prescribed medications for her to deal with such problems.

80.    However, Dr. Satyu found such medical conditions to be typical of a person of Sonia's age at that time — such being 76 to 81 years of age.

81.  Dr. Satyu did not note and could not recall any significant or appreciable decline in Sonia's condition during his treatment period.

82.  Dr. Satyu did not recall any degree of mental distress or deterioration suffered by Sonia during his treatment period.

83.  Sonia did not evidence to him any sign of elder abuse, nor did she complain of any stress or strain related to family issues or the handling of any financial problems.

84.  While acknowledging that Sonia was overweight during the time that he served as her doctor, he rejected the idea that she was in "poor physical condition." She was ambulatory, alert, and conversant.

85.  As he saw her every few months over a period of five to six years, Dr. Satyu witnessed no evidence that her mental faculties were failing to any significant degree or that Sonia ever evidenced symptoms or complaints that would have suggested the need for psychiatric or psychological evaluation or treatment.

86.  Dr. Satyu concluded that he had witnessed no appreciable decline in her condition in the five to six-year period in which he served as her primary care physician.

87.  Sonia admitted that Dr. Satyu had taken good care of her during that period and she confirmed that she never told him that she was unhappy or depressed.

88.  The only expert evidence presented in support of Sonia's claim of a deteriorated mental state over the past 20 years was that of Lissette Domiteaux, Ph.D.

89.  Dr. Domiteaux, a Dallas psychologist, first evaluated Sonia in February 2014 in Colorado, and then again in Texas immediately prior to the trial of this matter.

90.  She had discussions with Sonia's medical professionals in Colorado in 2014.

91.  Dr. Domiteaux also discussed Sonia with the current psychologist supervising the adolescent unit at Terrell State Hospital, where Sonia was formerly employed, but could not contact Sonia's contemporaries who formerly worked there.

92.  Dr. Domiteaux also engaged in discussions with selected family members about Sonia, all of whom were very sympathetic to her current litigation stance.

93.   Dr. Domiteaux opined at trial that, in the years preceding 2011, Sonia had been the victim of emotional abuse, resulting in anxiety and depression in that period.

94.   She further opined that, as a result of her isolation and emotional fragility, Sonia had been easily manipulated and influenced and was too emotionally compromised to resist domination by Stephen's strong personality.

95.   However, Dr. Domiteaux elected to forego any interview with any family member opposing Sonia's prosecution of this lawsuit nor did she review any deposition testimony or other documentary evidence from such sources.

96.   Further, Dr. Domiteaux's sources are primarily based in the post-2011 period, after Sonia had moved to Colorado upon learning that her trusted son, the respected Federal Reserve Bank professional, had been systematically raping her granddaughter for the past twelve years without her suspicion, knowledge or intervention.

97.   While the accuracy of the symptoms and observations described by Dr. Domiteaux may have existed upon Sonia's arrival in Colorado after the public disclosure of this family tragedy, there is an insufficient basis upon which to extrapolate that Sonia suffered from such conditions for a period of two decades back to the mid-1990s.

98.   Dr. Domiteaux's assessment of Sonia's condition is contrary to the observations of disinterested, qualified third parties who actually interacted with Sonia during the relevant time period.

99.   Dr. Domiteaux's assessment is also contradicted by evidence submitted in this case that establishes that, though Sonia generally deferred to the opinion and expertise of Stephen regarding the maintenance of her cash assets during the relevant time period, there were several incidences, even in the latter 2000's, in which Sonia evaluated and rejected Stephen's financial proposals, including the episodes over Kimberly's automobile and the amount to be contributed to the Lantana rental obligations.

100.   Dr. Domiteaux's assessment of Sonia's mental state for the relevant time period is speculative at best and is not credible.

101.   Sonia was cognitively aware of her financial transactions from 1993 through 2011, but elected not to take any punitive action against Stephen for any improper activity.

102.   Sonia's failure to take any punitive action against Stephen for any improper activity regarding her financial affairs from 1993 through 2011 may be attributable to various motivations, but not to the existence of a mental defect or incapacity.

103.   The Plaintiff has failed to establish by a preponderance of the evidence that Sonia suffered from a diminished or impaired mental state from 1993 through 2011.

104.   The Plaintiff has failed to establish by a preponderance of the evidence that Sonia suffered from clinical depression from 1993 through 2011.

105.   The Plaintiff has failed to establish by a preponderance of the evidence that Sonia was mentally incapable of perceiving or understanding any improper activity regarding her financial affairs from 1993 through 2011.

106.   The Plaintiff has failed to establish by a preponderance of the evidence that Sonia was mentally incapable of responding to any improper activity regarding her financial affairs from 1993 through 2011.

107.   The Plaintiff has failed to establish by a preponderance of the evidence that Sonia failed to take appropriate action against Stephen for any improper activity regarding her financial affairs because she was mentally or psychologically incapable of taking such action from 1993 through 2011.

108.   The Plaintiff has failed to establish by a preponderance of the evidence that Sonia was a person of "unsound mind" from 1993 through 2011.

109.   The Plaintiff has failed to establish by a preponderance of the evidence that, due to a mental illness or cognitive deficit, Sonia was unable to participate in or control the progression and disposition of a legal action from 1993 through 2011.

110.   The Plaintiff has failed to establish by a preponderance of the evidence that, due to a mental illness or cognitive deficit, Sonia was unable to understand the progression and disposition of a legal action from 1993 through 2011.

111.   The Plaintiff has failed to establish by a preponderance of the evidence that Stephen intentionally concealed from Sonia any improper activity regarding her

**Page 15 of  62**

financial affairs that would have suspended the running of the applicable statute of limitations.

112.   The Plaintiff has failed to establish by a preponderance of the evidence that Sonia was otherwise precluded, by Stephen or any other party, from learning of any improper activity perpetrated by the Defendants regarding her financial affairs.

113.   The Plaintiff has failed to establish by a preponderance of the evidence the existence of any improper activity perpetrated by the Defendants regarding Sonia's financial affairs that could not have been reasonably discovered by Sonia in a contemporaneous manner with reasonable care.

114.   The Plaintiff has failed to establish by a preponderance of the evidence the existence of any improper activity perpetrated by the Defendants regarding Sonia's financial affairs that could not have been reasonably discovered by Sonia in a contemporaneous manner with due diligence.

115.   The Plaintiff has failed to establish by a preponderance of the evidence the existence of any other circumstance which warrants the deferral of the date that any cause of action accrued in the Plaintiff's favor against either of the Defendants and which triggered the applicable statute of limitations.

116.   Because Sonia would have been injured at the time of each wrongful appropriation of her funds by Stephen, the Defendants have demonstrated that any cause of action held by Sonia against Stephen accrued at the time of each misappropriation.

117.   Accordingly, the statute of limitations for Sonia's recovery of each of the alleged acts of misappropriation or misconduct by Stephen would have expired no later than four (4) years after the date of each alleged act of misappropriation or misconduct.

118.   The Defendants have demonstrated by a preponderance of the evidence the applicability of the two-year statute of limitations pursuant to § 16.003(a) of the Texas Practice and Remedies Code as to each alleged act of embezzlement, each alleged act of taking the personal property of another, and each alleged act of conversion of personal property by the Defendants.

119.   Thus, the applicable statute of limitations precludes any recovery by the Plaintiff for any cause of action for embezzlement, conversion, or improper taking of personal property against either of the Defendants which accrued in the Plaintiff's

favor prior to January 20, 2010 — two years prior to the initiation of state court litigation by and among these parties over these transfers of assets.[31]

120.    The Defendants have demonstrated by a preponderance of the evidence the applicability of the four-year statute of limitations pursuant to § 16.004(a)(5) of the Texas Practice and Remedies Code as to each alleged breach of fiduciary duty by the Defendants.

121.    Thus, the applicable statute of limitations precludes any recovery by the Plaintiff for a breach of fiduciary duty against either of the Defendants which accrued in the Plaintiff's favor prior to January 20, 2008 — four years prior to the initiation of state court litigation by and among these parties over these transfers of assets.[32]

122.    Accordingly, the recovery of any amounts by Sonia against either of the Defendants will be limited to transactions which occurred on or after January 20, 2008.

123.    In light of the preclusion of the recovery of the 1997 gift toward the Defendants' acquisition of the Argyle property, and any subsequent funds appropriated by the Defendants prior to 2008 which were utilized in the improvement of the Defendants' Argyle property, due to the applicable statute of limitations, no grounds exist for the imposition of a constructive trust or an equitable lien upon the Defendants' Argyle property.

*Transactions Within Limitations Period*

124.    Because the Court has concluded that the recovery of any amounts by Sonia against either of the Defendants prior to January 20, 2008 is precluded by the applicable statute of limitations, the transactions which are subject to review encompass those which occurred on or after that date.

125.    Sonia acknowledges that certain transactions and withdrawals by Stephen within the limitations period were made with her advance knowledge and approval.

---

[31]    See *Sonia I. Douglass v. Stephen C. Douglass*, filed as Cause No. 2013-70855-43, in the 431st Judicial District Court in and for Denton County, Texas, on January 20, 2012.  This lawsuit was disclosed in Defendants' Statement of Financial Affairs, filed on September 27, 2013 [dkt #17] in their underlying bankruptcy case.

[32]    *Id.*

126.    The Plaintiff also withdrew at trial her request for recovery of several of the transaction amounts occurring within the allowable time frame, to the degree that such transactions reflected gifts for various occasions occurring within the family, including birthdays, weddings, etc.  Such items have been withdrawn from the Court's consideration.[33]

127.    On October 11, 2008, Stephen signed a check for $1,000.00 payable to himself on Sonia's Synergy Bank account [-4603].[34]  Such sums were deposited into Defendants' Chase account [-2084].[35]

128.    On July 24, 2009, Stephen completed an electronic transfer of $1,000.00 from Sonia's account ending in [-5761] to Defendants' account ending in [-5159].[36]

129.    The recovery of the two transfers listed above under theories of embezzlement, conversion, or under the Texas Theft Liability Act are barred by the applicable two-year statute of limitations.

130.    At the time of both of the above transfers, Stephen owed a fiduciary duty to Sonia.

131.    Stephen perpetrated the above two transfers of Sonia's funds to himself without the knowledge or consent of Sonia.

132.    Stephen has failed to prove by a preponderance of the evidence that, in light of his fiduciary duty to Sonia, these two particular transactions were fair and reasonable under the circumstances.

133.    In perpetrating the above two transfers of Sonia's funds to himself without Sonia's knowledge or consent, Stephen breached the fiduciary duty which he owed to Sonia.

134.    In perpetrating the above two transfers of Sonia's funds to himself without Sonia's

---

[33]  In this time period, the excluded gift transfers encompass the following Plaintiff's exhibits: 31; 32; 35; 37-44; 46 (excluding the Lantana property transfer therein); 51; and 53.

[34]  Plaintiff's Ex. 34 at p. 2.

[35]  Defendants' Ex. 8-V.

[36]  Plaintiff's Ex. 35.  The Chase statement identifies this transfer as Transaction #236448780.

knowledge or consent, Stephen's breach of his fiduciary duty to Sonia was performed for his personal benefit at the cost of inflicting an injury upon Sonia.

135.    In perpetrating the above two transfers of Sonia's funds to himself without Sonia's knowledge or consent, Stephen's actions constituted a defalcation while acting in a fiduciary capacity.

136.    On July 12, 2010,[37] Stephen withdrew $49,753.32 from an F&M Bank account ending in [-2600] and references a "C.O. Number 16082."[38]  The handwritten note on the exhibit reads "CD closing withdrawal ticket."[39]

137.    Stephen's redemption of this CD eleven (11) months prior to its maturity date incurred a net penalty of $246.68, leaving $49,753.32 as the withdrawn amount.[40]

138.    That withdrawn amount was deposited the next day into Stephen's Wachovia account [-2067].[41]

139.    Though she initially denied having given any authorization for Stephen to access this amount, Sonia had previously testified in a deposition that this significant sum was a no-interest loan which she agreed to make to Stephen, with no stated maturity date, in order to finance improvements to the Argyle property without the necessity of Stephen obtaining a commercial loan for that project.[42]

140.    Stephen has proven by a preponderance of the evidence that, based upon

---

[37]  Plaintiff's Ex. 5 notes this transaction occurred on July 10, 2010.

[38]  This "C.O. Number" is the same number associated with the Certificate of Deposit purchased on June 1, 2001, from Farmers & Merchants State Bank.

[39]  The language is present on the exhibits offered by both parties.

[40]  Defendants' Ex. 3-B. The full penalty charged for redeeming the $50,000.00 certificate of deposit prior to maturity was $262.50.  This amount was offset by an interest payment of $15.82.

[41]  Plaintiff's Ex. 12. Defendants' Ex. 3-C.

[42]  Defendants' Ex. N [State Court Deposition of Sonia I. Douglass] at 177:8-178:8; 182:19-185:14.  This deposition was given by Sonia in the state court case she initiated against the Defendants prior to bankruptcy in Cause No. 2013-70855-43 before the 431st Judicial District of Denton County, Texas.

disclosure of the material facts and Sonia's express consent, this July 2010 transfer was fair and reasonable, notwithstanding his fiduciary duty to Sonia.

141.   The Plaintiff has failed to prove by a preponderance of the evidence that this July 2010 transfer was performed by Stephen with a fraudulent intent.

142.   The Plaintiff has failed to prove by a preponderance of the evidence that this July 2010 transfer was performed by Stephen without Sonia's effective consent.

143.   The Plaintiff has failed to prove by a preponderance of the evidence that, in making this July 2010 transfer, Stephen intended to deprive Sonia of her rightful property.

144.   The Plaintiff has failed to prove by a preponderance of the evidence that Stephen breached the fiduciary duty which he owed to Sonia by making this July 2010 transfer.

145.   The Plaintiff has failed to prove by a preponderance of the evidence that Stephen's actions in making this July 2010 transfer constituted a defalcation while acting in a fiduciary capacity.

146.   While Sonia might otherwise have been entitled to recover a judgment for the unpaid loan of $49,753.32, it serves no purpose for the Court to liquidate that particular debt, and the Court declines to do so, because the Plaintiff has failed by a preponderance of the evidence to establish that Stephen perpetrated that transfer under circumstances that could render that debt nondischargeable.

147.   On December 31, 2010, Stephen withdrew $21,500 from Sonia's Chase account ending in [-5761] and procured a cashier's check payable to David McDavid Honda for the purchase of a new 2011 Honda Pilot SUV for Kimberly at the approximate cost of $43,000.[43]

148.   While Sonia acknowledged her initial, tentative agreement with Stephen to "pay halves" on an unspecified vehicle for Kimberly, Stephen did not subsequently consult with Sonia prior to the purchase as to any prospective automobile under consideration nor the size of the financial commitment associated with such a prospective purchase.

---

[43] Plaintiff's Ex. 45.

149. Though Sonia had given tentative "approval" for the concept of covering ½ of the anticipated cost of obtaining an automobile for Kimberly, the actual transfer of $21,500.00 by Stephen was accomplished without the effective, informed consent of Sonia.

150. At the time of the $21,500 transfer of Sonia's funds in December 2010, Sonia had a possessory right to those funds.[44]

151. At the time of the $21,500 transfer of Sonia's funds in December 2010, Stephen intended to deprive Sonia of her rightful property.

152. At the time of the $21,500 transfer of Sonia's funds in December 2010, Stephen inflicted an injury upon Sonia and she sustained damages as a result of his actions.

153. At the time of the $21,500 transfer of Sonia's funds in December 2010, Stephen owed a fiduciary duty to Sonia.

154. Stephen perpetrated the $21,500 transfer of Sonia's funds in December 2010 without the effective, informed consent of Sonia.

155. Stephen has failed to prove by a preponderance of the evidence that, in light of his fiduciary duty to Sonia, the $21,500 transfer of Sonia's funds in December 2010 was fair and reasonable under the circumstances.

156. In engaging in the $21,500 transfer of Sonia's funds in December 2010, Stephen breached the fiduciary duty which he owed to Sonia.

157. In engaging in the $21,500 transfer of Sonia's funds in December 2010, Stephen's breach of his fiduciary duty to Sonia was performed for his personal benefit, and that of his family, at the cost of inflicting an injury upon Sonia.

158. In perpetrating the $21,500 transfer of Sonia's funds in December 2010, Stephen's actions constituted a defalcation while acting in a fiduciary capacity.

159. On May 13, 2011, Stephen completed an electronic transfer of $1,250.00 from Sonia's Chase account ending in [-5761] to the Defendants' account ending in

---

[44] *See* conclusions of law ¶ 88-92 regarding fiduciary theft by joint account owner.

[-2084].[45]

160. On June 9, 2011, Stephen completed an electronic transfer of $1,300.00 from Sonia's Chase account ending in [-5761] to the Defendants' account ending in [-2084].[46]

161. On August 8, 2011, Stephen completed an electronic transfer of $2,000.00 from Sonia's Chase account ending in [-5761] to the Defendants' account ending in [-2084].[47]

162. Stephen perpetrated the above three transfers of Sonia's funds to himself without the knowledge or consent of Sonia.

163. Stephen has failed to prove by a preponderance of the evidence that, in light of his fiduciary duty to Sonia, these three 2011 transfers of Sonia's funds were fair and reasonable under the circumstances.

164. These three 2011 transfers of Sonia's funds by Stephen to himself without Sonia's knowledge or consent constituted an appropriation of funds by Stephen.

165. These three 2011 transfers of Sonia's funds were performed by Stephen for his personal use and benefit.

166. These three 2011 transfers of Sonia's funds were performed by Stephen with a fraudulent intent.

167. At the time of each of these three 2011 transfers of Sonia's funds, Sonia had a possessory right to those funds.[48]

---

[45] Plaintiff's Ex. 47; Defendants' Ex. 5-C and 5-D.  The Chase statement identifies this transfer as Transaction #2063995422.

[46] Plaintiff's Ex. 49. Defendants' Ex. M at p. 73. The Chase statement identifies this transfer as Transaction #2081786309.  At trial, Stephen claimed this amount was applied to defray costs related to his surgery.

[47] Plaintiff's Ex. 54. Defendants' Ex. M at p. 73. The Chase statement identifies this transfer as Transaction #2121241961.

[48] *See supra* note 44.

168.   At the time of each of these three 2011 transfers of Sonia's funds, the taking of Sonia's funds by Stephen was performed without Sonia's effective consent.

169.   At the time of each of these three 2011 transfers of Sonia's funds, Stephen intended to deprive Sonia of her rightful property.

170.   At the time of each of these three 2011 transfers of Sonia's funds, Stephen inflicted an injury upon Sonia and she sustained damages as a result of his actions.

171.   At the time of each of these three 2011 transfers of Sonia's funds, Stephen owed a fiduciary duty to Sonia.

172.   Stephen perpetrated each of these three 2011 transfers of Sonia's funds to himself without the knowledge or consent of Sonia.

173.   In perpetrating each of these three 2011 transfers of Sonia's funds to himself without Sonia's knowledge or consent, Stephen breached the fiduciary duty which he owed to Sonia.

174.   In perpetrating each of these three 2011 transfers of Sonia's funds to himself without Sonia's knowledge or consent, Stephen's breach of his fiduciary duty to Sonia was performed for his personal benefit at the cost of inflicting an injury upon Sonia.

175.   In perpetrating each of these three 2011 transfers of Sonia's funds to himself without Sonia's knowledge or consent, Stephen's actions constituted a defalcation while acting in a fiduciary capacity.

*Revelation of Sexual Abuse and the Lantana Transfers*

176.   In mid-2011, upon reaching majority age, the Defendants' only daughter revealed to her immediate family that her father had been sexually abusing her since the age of six.

177.   Sonia was not informed of the revelations about her granddaughter.

178.   To ensure the daughter's safety, Kimberly and the children vacated the Argyle property and rented a single family home in the Lantana, Texas area for the sum of $2,000 per month.

179.   Stephen approached Sonia for permission to utilize her cash for the payment of the monthly rental.

180.   Sonia was not told the true reason why a separate residence had become necessary.

181.   Sonia was told instead that the Argyle property had to be vacated temporarily in order for certain repairs to be made to the property.

182.   Sonia agreed that Stephen could withdraw only $1,000 from her cash assets instead of the requested $2,000 monthly payment.  She did not authorize any withdrawal in subsequent months.

183.   Notwithstanding the $1,000 limitation imposed by Sonia, on May 5, 2011, Stephen withdrew the entire $2,000 payment from Sonia's account [-5761] for the Lantana monthly rent for May 2011.[49]

184.   On May 31, 2011, Stephen completed an electronic transfer of $1,600.00 from Sonia's Chase account ending in [-5761] to the Defendants' account ending in [-2084] in order to pay a substantial portion of the Lantana rental for June 2011.[50]

185.   In subsequent months, until he began his efforts to elude law enforcement officers in early December 2011, Stephen repeatedly and intentionally violated Sonia's directions by withdrawing from Sonia's Chase account ending in [-5761] the sum of  $2,000.00 to pay the Lantana rental for July,[51] August,[52] September,[53]

---

[49]   Plaintiff's Ex. 45 & 46. Defendants' Ex. 5-D.  The Chase bank statement identifies this transfer as Transaction#: 2058725104.  The remaining $500 involved in this transaction was utilized with Sonia's permission to purchase two birthday gifts of $250 each.

[50]   Plaintiff's Ex. 48. Defendants' Ex. M at p. 73.  The transaction occurred on May 31, 2011 and the Chase statement identifies this transfer as Transaction # 2075187528.

[51]   Plaintiff's Ex. 50. Defendants' Ex. M at p. 75.  The transaction occurred on June 30, 2011 and the Chase statement identifies this transfer as Transaction #  2101704385.

[52]   Plaintiff's Ex. 52. Defendants' Ex. M at p. 78.  The transaction occurred on July 29, 2011 and the Chase statement identifies this transfer as Transaction # 2114488538.

[53]   Plaintiff's Ex. 55. Defendants' Ex. M at p. 82.  The transaction occurred on August 25, 2011 and the Chase statement identifies this transfer as Transaction # 2132197503

October,[54] and November 2011.[55]

186.   Stephen perpetrated the above seven transfers of Sonia's funds to himself to pay for the Lantana property rental without the effective, informed consent of Sonia.

187.   These seven 2011 transfers of Sonia's funds by Stephen to pay for the Lantana property rental without Sonia's effective knowledge or consent constituted an appropriation of funds by Stephen.

188.   These seven 2011 transfers of Sonia's funds by Stephen to pay for the Lantana property rental were performed by Stephen for his personal use and benefit.

189.   These seven 2011 transfers of Sonia's funds by Stephen to pay the Lantana property rental were performed by Stephen with a fraudulent intent.

190.   At the time of each of these seven 2011 transfers of Sonia's funds to pay the Lantana property rental, Sonia had a possessory right to those funds.

191.   At the time of each of these seven 2011 transfers of Sonia's funds to pay the Lantana property rental, the taking of Sonia's funds by Stephen was performed without Sonia's effective consent.

192.   Stephen has failed to prove by a preponderance of the evidence that, in light of his fiduciary duty to Sonia, these seven 2011 transfers of Sonia's funds were each fair and reasonable under the circumstances.

193.   At the time of each of these seven 2011 transfers of Sonia's funds to pay the Lantana property rental, Stephen intended to deprive Sonia of her rightful property.

194.   At the time of each of these seven 2011 transfers of Sonia's funds to pay the Lantana property rental, Stephen inflicted an injury upon Sonia and she sustained damages as a result of his actions.

---

[54]   Plaintiff's Ex. 56. Defendants' Ex. M at p. 84.  The transaction occurred on September 23, 2011 and the Chase statement identifies this transfer as Transaction # 2151860858.

[55]   Plaintiff's Ex. 57. Defendants' Ex. 5-J & M at p. 87.  The transaction occurred on November 7, 2011 and the Chase statement identifies this transfer as Transaction # 2183092801.

195.   At the time of each of these seven 2011 transfers of Sonia's funds to pay the Lantana property rental, Stephen owed a fiduciary duty to Sonia.

196.   Stephen perpetrated each of these seven 2011 transfers of Sonia's funds to pay the Lantana property rental without the effective knowledge or consent of Sonia.

197.   In perpetrating each of these seven 2011 transfers of Sonia's funds for the purpose of paying the Lantana property rental without Sonia's effective knowledge or consent, Stephen breached the fiduciary duty which he owed to Sonia.

198.   In perpetrating each of these seven 2011 transfers of Sonia's funds for the purpose of paying the Lantana property rental without Sonia's effective knowledge or consent, Stephen's breach of his fiduciary duty to Sonia was performed for his personal benefit at the cost of inflicting an injury upon Sonia.

199.   In perpetrating each of these seven 2011 transfers of Sonia's funds for the purpose of paying the Lantana property rental without Sonia's effective knowledge or consent, Stephen's actions constituted a defalcation while acting in a fiduciary capacity.

*The Final Emergency Request*

200.   In late November 2011, Stephen learned that he was being sought by law enforcement agencies investigating the sexual assaults against his daughter.

201.   Stephen abruptly resigned his position with the Federal Reserve Bank.

202.   Stephen then contacted Sonia on December 1, 2011, sobbing and pleading that he needed her immediate financial help, and promising to repay all borrowed amounts upon his sale of the Argyle property.

203.   Stephen did not inform Sonia about the sexual abuse allegations, nor did he specify an intended use for the requested funds.

204.   Responding lovingly to the despair and distress conveyed by her son, Sonia voluntarily agreed to provide financial assistance to him without knowing the precise amount of the loan or its precise purpose.

205.   Sonia effectively told Stephen to take what he needed.

206.   Sonia reassured Stephen that there was no need to sell the Argyle property because

she was willing to lend the needed funds to him and that she trusted him to repay the amounts at some point without the need of selling his home.

207.   Sonia specifically instructed Stephen to withdraw needed funds from the Chase Bank savings account before invading the Chase checking account.[56]

208.   On December 1, 2011, Stephen withdrew $40,000.00 from the Chase savings account ending in [-3638] using a withdrawal slip.[57]  Most of the cash was eventually applied to the payment of criminal defense attorneys' fees for Stephen.

209.   It was at that point that Stephen disappeared for two to three months until he was apprehended by law enforcement authorities on the sexual abuse charges.[58]

210.   Sonia now complains that she did not authorize such a large withdrawal and that she was unaware that the emergency related to criminal charges of such a sordid type.

211.   However, the evidence demonstrates that Sonia was not misled in this transaction and that she authorized Stephen to access her funds to the extent needed by Stephen to address the unexplained emergency circumstances.

212.   Stephen has proven by a preponderance of the evidence that, based upon disclosure of the material facts and Sonia's express consent, this $40,000 transfer was fair and reasonable, notwithstanding his fiduciary duty to Sonia.

213.   The Plaintiff has failed to prove by a preponderance of the evidence that this $40,000 transfer was performed by Stephen with a fraudulent intent.

214.   The Plaintiff has failed to prove by a preponderance of the evidence that this $40,000 transfer was performed by Stephen without Sonia's effective consent.

215.   The Plaintiff has failed to prove by a preponderance of the evidence that, in

---

[56]   This conversation was explicitly detailed in Sonia's journal.  See Defendants' Ex. M at Bates p. 0160.

[57]   Plaintiff's Ex. 11. Defendants' Ex. 3-D & 3-F.

[58]   Stephen was eventually charged with seven felony counts.  He pled guilty to one count of aggravated sexual assault of a child and was sentenced to a 10-year prison term.

**Page 27 of  62**

making this $40,000 transfer, Stephen intended to deprive Sonia of her rightful property.

216. The Plaintiff has failed to prove by a preponderance of the evidence that Stephen breached the fiduciary duty which he owed to Sonia by making this $40,000 transfer.

217. The Plaintiff has failed to prove by a preponderance of the evidence that Stephen's actions in making the $40,000 transfer constituted a defalcation while acting in a fiduciary capacity.

218. While Sonia might otherwise have been entitled to recover a judgment for the unpaid loan of $40,000.00, it serves no purpose for the Court to liquidate that particular debt, and the Court declines to do so, because the Plaintiff has failed by a preponderance of the evidence to establish that Stephen perpetrated that transfer under circumstances that could render that debt nondischargeable.

*Actual Damages Against Stephen Charles Douglass*

219. The Court finds that, within the applicable limitations period, Stephen removed $41,650.00 from Sonia's accounts without her authorization and breached the obligations he owed to Sonia as a fiduciary.

220. As a result of Stephen's unauthorized transfers from Sonia's accounts in breach of his fiduciary duties to her, Sonia has sustained actual damages in the amount of $41,650.00, for which Stephen is liable.

221. $39,650.00 of the $41,650.00 which Stephen removed from Sonia' accounts without her authorization also constituted a civil theft.[59]

222. The Plaintiff is entitled to an additional statutory damage award of $1,000.00 against Stephen as a result of his multiple violations of the Texas Theft Liability Act.

---

[59]   Since the amount awarded for civil theft is duplicative of the amount awarded to the Plaintiff for Stephen's breach of fiduciary duty, the Plaintiff may only receive a single recovery of these damages. *Drexel Highlander Ltd. P'ship v. Edelman (In re Edelman)*, 2014 WL 1796217, at *33 (Bankr. N.D. Tex., May 6, 2014).

*Actual Damages Against Kimberly A. Douglass*

223.   The Plaintiff has failed to demonstrate by a preponderance of the evidence that Defendant Kimberly A. Douglass acted in a fiduciary capacity as to the Plaintiff at any time.

224.   The Plaintiff has failed to demonstrate by a preponderance of the evidence that a trust relationship existed between Sonia and Defendant Kimberly A. Douglass prior to the creation of any indebtedness in question.

225.   The Plaintiff failed to establish by a preponderance of the evidence that Defendant, Kimberly Ann Douglass, knowingly participated in a breach of fiduciary duty.

226.   The Plaintiff has failed to demonstrate by a preponderance of the evidence that Defendant Kimberly A. Douglass appropriated any funds from the Plaintiff with a fraudulent intent.

*Objections to Claims of Exemption and Other Affirmative Relief*

227.   On February 10, 2014, Sonia filed a First Amended Objection to Debtors' Exemptions in the Defendants' Chapter 7 bankruptcy case.

228.   The Defendant-Debtors have utilized the Argyle property exclusively as their home from its acquisition in 1997 to the present date.

229.   The Defendant-Debtors established that they have intended for the Argyle property to be their exclusive homestead from its acquisition in 1997 to the present date.

230.   Such use as a home, combined with the uncontradicted, stated intent of the Defendant-Debtors to claim the Argyle property as their homestead, is sufficient to qualify the Argyle property for the homestead exemption, as claimed on the Debtors' Schedule C.

231.   Because the Defendant-Debtors have sustained their initial burden to establish that the Argyle property qualifies for the exemption claimed, the Plaintiff is obligated to go forward with the evidence to sustain her burden under FED. R. BANKR. P. 4003(c) to show that the homestead exemption is not properly claimed.

232.   The Plaintiff's challenge to the Defendant-Debtors' homestead exemption claim as

to the Argyle property is based upon the Plaintiff's underlying allegation that stolen funds had been used to acquire the Argyle property.

233.   The objection to the homestead exemption claim was also based upon the Plaintiff's underlying allegation that the Argyle property was subsequently improved with funds unlawfully taken from the Plaintiff.

234.   Because the Plaintiff is precluded by the applicable statute of limitations from challenging the legitimacy of the 1997 gift toward the Defendants' acquisition of the Argyle property, and from any subsequent funds appropriated by the Defendants prior to 2008 which were utilized in the improvement of the Defendants' Argyle property, the Plaintiff has failed to demonstrate by a preponderance of the evidence that stolen funds were used by the Defendants to acquire or to improve the Argyle property.

235.   Because the Plaintiff is precluded by the applicable statute of limitations from challenging the legitimacy of the 1997 gift toward the Defendants' acquisition of the Argyle property, and from any subsequent funds appropriated by the Defendants prior to 2008 which were utilized in the improvement of the Defendants' Argyle property, the Plaintiff has failed to demonstrate by a preponderance of the evidence that the Defendants' homestead was improperly improved with cash converted from Sonia with an intent to hinder, delay, or defraud her.

236.   Because no grounds exist for the imposition of a constructive trust or an equitable lien upon the Defendants' Argyle property, the Plaintiff has failed to demonstrate by a preponderance of the evidence that any equitable ground exists by which the Defendants' homestead exemption claim can be defeated or curtailed.

237.   The Plaintiff's exemption objection also challenged certain of the Defendant-Debtors' personal property exemption claims.

238.   At trial, the Plaintiff either abandoned or failed to demonstrate by a preponderance of the evidence that certain items of personal property were not entitled to be claimed as exempt because they constituted the personal property of another.[60]

---

[60]   These items of personal property, as contained in the objection, included two coin collections, jewelry, guns, tools, and woodshop equipment.  The parties announced at trial that the dispute regarding many of these items had been resolved by agreement. To the extent that they remain unresolved, the Plaintiff has failed to defeat the exemption claims.

239.    The Plaintiff's exemption objection also encompassed a challenge to the
        Defendant-Debtors' claims of exemption as to certain automobiles.

240.    The Defendant-Debtors have demonstrated the grounds that otherwise entitle them
        to the exemption of the referenced automobiles and the Plaintiff did not challenge
        this general entitlement.

241.    The sole basis for the objection to the exemption claims on automobiles was "that
        funds used to purchase these vehicles were pilfered from Sonia."

242.    The Plaintiff, as the objecting party, has failed to demonstrate by a preponderance
        of the evidence that the exemption of the 2006 Honda Accord and the 2000 Ford
        Excursion should be denied.

243.    Further, the Plaintiff withdrew at trial her request for recovery of gifts made for
        family members.  Included among those withdrawn was the request to recover the
        sums used to purchase a 2006 Toyota Tundra pickup for Tim Douglass.  Thus,
        based upon that withdrawal, the Plaintiff has failed to demonstrate by a
        preponderance of the evidence that the exemption of the 2006 Toyota Tundra
        should be denied.

244.    The only vehicle to which an improper transfer of Sonia's funds was traced was
        the 2011 Honda Pilot, which was purchased in part by Stephen's transfer of
        $21,500 from Sonia's account in December 2010 and constituted both a civil theft
        and a breach of Stephen's fiduciary duty to Sonia.

245.    It would be unjust and unconscionable to allow the Defendants, as the holders of
        the legal title to the 2011 Honda Pilot automobile, to retain without encumbrance
        such personal property that was wrongfully obtained through the improper
        diversion of $21,500 from Sonia's account by Stephen.

246.    To prevent the unjust enrichment arising from the December 2010 transfer, an
        equitable lien is imposed in favor of Sonia upon the Defendants' 2011 Honda Pilot
        automobile in order to secure, to the degree possible, the recovery of the $21,500
        wrongfully taken from her by Stephen.

247.    To prevent the unjust enrichment arising from the December 2010 transfer, the
        equitable lien in favor of Sonia imposed by the Court upon the Defendants' 2011
        Honda Pilot automobile is superior in right to any exemption claim otherwise

asserted by the Defendants.

248.   The Plaintiff's First Amended Objection to Debtors' Exemptions is sustained in part and denied in part, such that any exemption claim of the Defendant-Debtors as to the 2011 Honda Pilot automobile pursuant to Chapter 42 of the Texas Property Code is subordinated to the equitable lien granted to the Plaintiff to secure the recovery of the $21,500 wrongfully diverted from Sonia's account by Stephen.

249.   All other relief sought by the Plaintiff's First Amended Objection to Debtors' Exemptions is denied.

250.   To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.


# CONCLUSIONS OF LAW

*Jurisdiction and Allocation of Judicial Power*

1.   This Court has subject matter jurisdiction under 28 U.S.C. § 1334 and 11 U.S.C. § 523.  This Court has personal jurisdiction over the parties to this adversary proceeding.

2.   This Court has authority to enter a final judgment in this adversary proceeding since it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(I) and (O) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

3.   This Court has the authority to enter a final judgment on an unliquidated claim when determining the dischargeability of that debt in a bankruptcy case.  *Morrison v. Western Builders (In re Morrison)*, 555 F.3d 473, 478–79 (5th Cir. 2009).

4.   Such authority recognized by the Fifth Circuit is consistent with decisions of sister courts of appeal.  *See, e.g., Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1017–18 (9th Cir.1997); *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965–66 (6th Cir.1993); *Abramowitz v. Palmer*, 999 F.2d 1274 (8th Cir.1993); *N.I.S. Corp. v. Hallahan (In re Hallahan)*, 936 F.2d 1496, 1508 (7th Cir.1991).

5.   The recognized authority of a bankruptcy court to enter a final judgment on an unliquidated claim when determining the dischargeability of that debt in a

bankruptcy case was not impaired by *Stern v. Marshall*, ––– U.S. ––––, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). *See, e.g., Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 313 (Bankr. N.D. Tex. 2011) ["Stern does not hold, directly or indirectly, that an Article I tribunal is without the Constitutional authority to liquidate a creditor's claim against a debtor through entry of a final dollar judgment and then determine whether that judgment is dischargeable in the debtor's bankruptcy case."].

6.     The Plaintiff's Complaint seeks a determination that the debt which it alleges is owed to it should be excepted from discharge under various subsections of §523(a).

7.     In seeking such an exception to the Debtors' discharge, the Plaintiff assumes the burden of proof under a preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

8.     All exceptions to discharge under §523 "must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start."[61] *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 619 (5th Cir. 2011) (citing *Hudson v. Raggio & Raggio, Inc. (In re Hudson),* 107 F.3d 355, 356 (5th Cir. 1997)). [62]

*Statute of Limitations - Texas Law*

9.     In general, a statute of limitations begins to run when a particular cause of action accrues. *S.V. v. R.V.,* 933 S.W.2d 1, 4 (Tex.1996); *Tipton v. Brock*, 431 S.W.3d 673, 677 (Tex. App. – El Paso 2014, pet. denied).

10.    A cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a claimant to seek a judicial remedy. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.,* 348 S.W.3d 194, 202 (Tex. 2011); *Lazy R*

---

[61]   However, a fresh start is not promised to all who file for bankruptcy relief, but only to "the honest but unfortunate debtor." *Grogan*, 498 U.S. at 286-87.

[62]   However, the Fifth Circuit has noted that there are limits to the maxim that exceptions to dischargeability are to be construed narrowly in favor of the debtor, particularly in situations falling under an exception to dischargeability in a case in which a debtor has committed fraud. *See generally Deodati v. M.M. Winkler & Associates (In the Matter of: M.M. Winkler & Associates),* 239 F.3d 746, 751 (5th Cir. 2001).

*Ranch, L.P. v. ExxonMobil Corp.*, 456 S.W.3d 332, 338 (Tex. App.—El Paso 2015, pet. filed).

11.   Tort claims accrue "when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *S.V.,* 933 S.W.3d  at 4.

12.   Expressed differently, a cause of action accrues when a plaintiff knows or reasonably should know that she has been injured, even though she does not fully know the extent of her injuries.  *See Murphy v. Campbell*, 964 S.W.2d 265, 273 (Tex. 1997).

13.   Thus, "[o]nce a claimant learns of a wrongful injury, the statute of limitations begins to run even if the claimant does not yet know the specific cause of the injury; the party responsible for it; the full extent of it; or the chances of avoiding it." *Gonzales v. Sw. Olshan Found. Repair Co., LLC*, 400 S.W.3d 52, 58 (Tex. 2013) (internal quotations omitted).

14.   "The date the cause of action accrues for purposes of limitations is a question of law." *Seureau v. ExxonMobil Corp.,* 274 S.W.3d 206, 226 (Tex. App. – Houston [14th Dist.] 2008, no pet.).

15.   A cause of action for breach of fiduciary duty, civil theft and/or embezzlement accrued in Sonia's favor no later than the date of her receipt of bank statements evidencing each improper diversion of her funds by Stephen.

16.   A claim for conversion of personal property or for the taking the personal property of another under Texas law is subject to a two-year statute of limitations.  1A Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) (Vernon Supp. 2014).

17.   The two-year statute of limitations accordingly applies to a claim asserted under the Texas Theft Liability Act.  *J & J Sports Productions, Inc. v. JWJ Mgmt. Inc.*, 324 S.W.3d 823 (Tex. App.– Fort Worth 2010, no pet.); *Malik v. ConocoPhillips Co.*, 2014 WL 3420775, at *5 (E.D. Tex., June 23, 2014); *Pemex Exploracion y Produccion v. BASF Corp.*, 2013 WL 5514944, at *10 (S.D. Tex., Oct. 1, 2013).

18.   The two-year statute of limitation applies to a claim for embezzlement.  *Winn v. Holdaway (In re Holdaway)*, 388 B.R. 767, 781 (Bankr. S.D. Tex. 2008) (citing *Steinhagen v. Ehl,* 126 S.W.3d 623, 627 (Tex. App. – Beaumont 2004, pet. denied).

19.   A claim for breach of fiduciary duty under Texas law is subject to a four-year statute of limitations. 1A Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a)(5) (Vernon 2002).

20.   A defendant bears the burden of proving his affirmative defenses, including his argument that this action is barred by the statute of limitations. *Light v. Whittington (In re Whittington)*, 530 B.R. 360, 377 (Bankr. W.D. Tex. 2014), (citing *Elmo v. Oak Farms Dairy,* 2008 WL 2200265, at *1 (N.D. Tex., May 14, 2008)).

21.   The Defendants have properly demonstrated that the applicable statute of limitations — § 16.003(a) of the Texas Practice and Remedies Code — precludes any recovery by the Plaintiff for any cause of action for embezzlement, conversion, for liability under the Texas Theft Liability Act, or for any other improper taking of personal property against either of the Defendants which accrued in the Plaintiff's favor prior to January 20, 2010 — two years prior to the initiation of state court litigation by and among these parties over these transfers of assets, in the absence of proof that the accrual of such cause of action should be deferred under applicable law.

22.   The Defendants have properly demonstrated that the applicable statute of limitations — § 16.004(a)(5) of the Texas Practice and Remedies Code — precludes any recovery by the Plaintiff for any cause of action for breach of fiduciary duty against either of the Defendants which accrued in the Plaintiff's favor prior to January 20, 2008 — four years prior to the initiation of state court litigation by and among these parties over these transfers of assets, in the absence of proof that the accrual of such cause of action should be deferred under applicable law.

*Extending the Statute of Limitations - Discovery Rule*

23.   Since the Defendants have otherwise upheld their burden to establish the validity of their limitations defenses, the Plaintiff assumes the burden of proof as to the proper application of the discovery rule. *Whittington,* 530 B.R. at 377 (citing *Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 518 (Tex.1988)).

24.   "[T]he discovery rule [is] a "very limited exception to statutes of limitations," which defers the accrual of the cause of action until the injury was or could have reasonably been discovered. *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 929-30 (Tex.

2011) (*citing Computer Assocs. Int'l. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996)).

25.    "The discovery rule is an exception to the limitations period that tolls the statute of limitations when the alleged wrongful act and resulting injury are inherently undiscoverable at the time they occurred but may be objectively verified." *Doe v. St. Stephen's Episcopal School,* 382 F. App'x 386, 387 (5th Cir. 2010) (citing *S.V.*, 933 S.W.2d at 6.).

26.    The discovery rule applies "only when the nature of the plaintiff's injury is both inherently undiscoverable and objectively verifiable." An injury is inherently undiscoverable if, by its nature, it is "unlikely to be discovered within the prescribed limitations period despite due diligence." The legal question of whether an injury is inherently undiscoverable is determined on a categorical basis. *Id.* (citations omitted).

27.    "The requirement of inherent undiscoverability recognizes that the discovery rule exception should be permitted only in circumstances where it is difficult for the injured party to learn of the negligent act or omission." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996) (quotations omitted).

28.    The application of the discovery rule should be "few and narrowly drawn." *Estate of Jobe v. Berry*, 428 S.W.3d 888, 903 (Tex. App.– Texarkana 2014, no pet.) (citing *S.V.*, 933 S.W.2d at 25).

29.    Accordingly, "the question here is not whether [the Plaintiff] detected the alleged improper [transactions and/or transfers] within the limitations period. Rather, [the court] must decide whether [the Plaintiff's] is "the type of injury that generally is *discoverable* by the exercise of reasonable diligence." *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 735 (Tex. 2001) (*citing HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998) (emphasis added)).

30.    Though the Supreme Court of Texas has suggested that a fiduciary's misconduct may be inherently undiscoverable for the purposes of the discovery rule,[63] "when the fact of a fiduciary's misconduct becomes apparent, the person owed the fiduciary duty is no longer relieved of the duty to exercise reasonable care and

---

[63] *See, e.g., Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988).

diligence to discover the existence of a cause of action." *West v. Proctor*, 353 S.W.3d 558, 566 (Tex. App. – Amarillo 2011, pet. denied); *Whittington,* 530 B.R. at 403-04.

31.   The diversion of funds by Stephen, and the resulting injury suffered by Sonia, not only could have been discovered through reasonable care and diligence, it was discovered and known to Sonia no later than the date of her receipt of bank statements evidencing each improper diversion of her funds by Stephen

32.   The Plaintiff failed to establish any entitlement to the application of the discovery rule to extend the respective statutes of limitation which otherwise apply.

*Extending the Statute of Limitations - Fraudulent Concealment Doctrine*

33.   The fraudulent concealment doctrine is a form of equitable estoppel that, if proven, prevents a defendant "from relying on the statute of limitations as an affirmative defense[.]" *Lazy R Ranch,* 456 S.W.3d at  338.

34.   It is an equitable, fact-specific doctrine recognized under Texas law which tolls a statute of limitations "based on the rationale that a person cannot avoid liability for her actions by deceitfully concealing wrongdoing until limitations has run." *Vanderpool v. Vanderpool*, 442 S.W.3d 756, 768 (Tex. App. – Tyler 2014, no pet.).

35.   "Fraudulent concealment only tolls the running of limitations until the fraud is discovered or could have been discovered with reasonable diligence." *Lazy R Ranch,* 456 S.W.3d at 339 (citing *BP Am. Prod. Co. v. Marshall,* 342 S.W.3d 59, 67 (Tex. 2011)).

36.   While fraudulent concealment can defer accrual of a cause of action under limitations, the party seeking to avoid application of limitations has the burden to plead and secure a finding of fraudulent concealment. *Tipton*, 431 S.W.3d at 681; *West,* 353 S.W.3d at 565.

37.   For fraudulent concealment to apply, the plaintiff must prove that the defendant: (1) had actual knowledge of the wrong; (2) had a fixed purpose to conceal the wrong; and (3) did conceal the wrong from the plaintiff.  *Shell Oil,* 356 S.W.3d at 927.

38.    The Plaintiff failed to establish any entitlement to the application of the fraudulent concealment doctrine to extend the respective statutes of limitation which otherwise apply.

*Extending the Statute of Limitations - Continuing Tort Doctrine*

39.    The continuing tort doctrine is an exception to the running of a statute of limitations which involves continuing wrongful conduct and continuing injury. *Malone v. Sewell*, 168 S.W.3d 243, 250 (Tex. App. – Fort Worth 2005, pet. denied);  *Dickson Constr., Inc. v. Fid. and Deposit Co. of Maryland,* 960 S.W.2d 845, 851 (Tex. App.– Texarkana 1997, no writ).

40.    Because it addresses an ongoing wrong causing a continuing injury, the limitations period for a continuing tort does not begin to run until the tortious conduct ceases. *Houston Poly Bag I, Ltd. v. Kujanek*, 370 S.W.3d 82, 93 (Tex. App.– Houston [14th Dist.] 2012, no pet.) (citing *Markwardt v. Texas Indus., Inc.,* 325 S.W.3d 876, 893 (Tex. App.– Houston [14th Dist.] 2010, no pet.)).

41.    The Court could not locate a Texas case in which the continuing tort doctrine was actually applied to a claim for breach of a fiduciary duty.

42.    Indeed, the existence of the continuing tort doctrine has never been actually endorsed by the Supreme Court of Texas, though it is often applied by Texas intermediate courts.  *Id.; Gen. Universal Sys., Inc. v. HAL, Inc*., 500 F.3d 444, 451 (5th Cir. 2007); *U.S. Bank, N.A. v. Smith (In re Smith)*, 524 B.R. 125, 139 (Bankr. S.D. Tex. 2015).

43.    However, the Court notes that the continuing tort doctrine has been applied at least once in a §523(a)(4) case.  *See Mullen v. Jones (In re Jones)*, 445 B.R. 677, 719 n.124 (Bankr. N.D. Tex. 2011).

44.    Assuming, for the sake of argument, its applicability to fiduciary duty cases, the continuing tort doctrine is nonetheless rooted in a plaintiff's inability to know ongoing conduct is causing his injury.

45.    "[T]hus, the rationale for the doctrine no longer applies if the claimant has discovered his injury and its cause and the statute commences to run upon discovery." *Thomas v. Carnahan Thomas, LLP,* 2014 WL 465818, at *9 (Tex. App. – Dallas, Feb. 4, 2014, pet. denied) (citing *Markwardt,* 325 S.W.3d at 894).

46.    The Plaintiff failed to establish any entitlement to the application of the continuing tort doctrine to extend the respective statutes of limitation which otherwise apply.

*Exemption Issues*

47.    Federal Rule of Bankruptcy Procedure 4003(c) clearly and unequivocally places the ultimate burden of persuasion in any contested matter over the validity of a debtor's exemption claims upon the party objecting to a debtor's claimed exemptions.  *In re Harrington*, 306 B.R. 172, 181 (Bankr. E.D. Tex. 2003).

48.    Although in the face of an objection this Court believes that a debtor must sustain a minimal burden of going forward with the evidence to establish that the referenced property qualifies for the particular exemption claimed before the objecting party is obligated to go forward with its proof, that burden is easily satisfied in most cases.  *Id.*

49.    This is consistent with Texas law in this area which requires any homestead claimant to prove that the property claimed as homestead actually qualifies for the homestead exemption.  *See, e.g., Perry v. Dearing (In re Perry),* 345 F.3d 303, 311 (5th Cir. 2003) ["The claimant has the initial burden of establishing homestead status."] (*citing Burk Royalty Co. v. Riley,* 475 S.W.2d 566, 568 (Tex. 1972) and *Bradley v. Pac. Sw. Bank (In re Bradley),* 960 F.2d 502, 507 (5th Cir. 1992) ["It is well settled in Texas that an individual who seeks homestead protection has the initial burden to establish the homestead character of her property."].

50.    However, there is no disagreement that the ultimate burden of persuasion (or the risk of non-persuasion) always rests upon the objecting party under Rule 4003(c). "The case law generally holds that once the debtor makes this *prima facie* showing, the burden shifts, and the ultimate burden of persuasion is on the objecting party to present evidence that the claim cannot be sustained under applicable local law." *Harrington,* 306 B.R. at 182.

51.    In fact, as summarized by the court in *In re Cole,* 205 B.R. 382 (Bankr. E.D. Tex. 1997):

> Under Bankruptcy Rule 4003(c), the objecting party has the burden of proving that the exemptions claimed . . . are not properly claimed . . . *When an issue is in doubt because of the proof provided and the Court would be required to*

> *speculate, the party upon whom the burden of proof ultimately rests must lose. Id.* at 162.  Thus, the exemptions claimed by the Debtors are presumed valid until proven otherwise.

*Id.* at 384–85 (emphasis added and citations omitted).

52.    The Defendant-Debtors elected to claim exemptions under Texas law, as authorized by 11 U.S.C. §522(b).

53.    The Court therefore looks to Texas law in assessing the Debtor's claimed exemptions.  *Bradley,* 121 B.R. at 312, *rev'd on other grounds*, *In re Bradley*, 960 F.2d 502 (5th Cir. 1992).

54.    The Texas Constitution and the Texas Property Code both provide for an exemption to  protect a debtor's homestead from seizure for the claims of creditors, except for encumbrances which are "properly fixed" on the homestead property.[64]

55.    In order to advance the protective purposes for which it was created, Texas courts have always liberally construed any claimed homestead exemption.  *Woods v. Alvarado State Bank*, 19 S.W.2d 35 (Tex. 1929) ["The rule that homestead laws are to be liberally construed to effectuate their beneficent purpose is one of general acceptation."] (*citing Trawick v. Harris*, 8 Tex. 312 (Tex. 1852)).

56.    Generally, in order to assert homestead rights in a particular property, a person must use the property as a home.  3 TEX. CONST. ANN. art. XVI, §51 (Vernon Supp. 2014); 4 TEX. PROP. CODE ANN. §41.002(a), (b) (Vernon 2014). *See also Claflin*, 761 F.2d at 1091 ["the purpose of the homestead exemption laws is to protect the possession and enjoyment of the individual in property which is *used as his or her home* (*emphasis added)*]; *Yates v. Home Bldg. & Loan Co.*, 103 S.W.2d 1081, 1084-85 (Tex. Civ. App. – Beaumont 1937, no writ) ["Homestead rights in a house cannot be acquired by mere intention, but to effectuate the intent actual use of the property as a home must concur."].

57.    The homestead protection afforded by the Texas Constitution, however, was never intended to protect stolen funds. *Bransom v. Standard Hardware, Inc.*, 874 S.W.2d

---

[64] Section 41.001(a) of the Texas Property Code states that "[a] homestead . . . [is] exempt from seizure for the claims of creditors except for encumbrances properly fixed on homestead property."  4 TEX. PROP. CODE ANN. § 41.001(a) (Vernon 2014).

919, 928 (Tex. App. – Fort Worth 1994, writ denied) and cases cited therein.

58.   Stolen funds used for the purchase of a homestead or improvement of an existing homestead can never acquire homestead rights as they are held in trust for the rightful owners of the funds. *Id. (citing First State Bank v. Zelesky,* 262 S.W. 190, 192 (Tex. Civ. App.– Galveston 1924, no writ) and *Smith v. Green,* 243 S.W. 1006, 1008 (Tex. Civ. App.– Amarillo 1922, writ ref'd)).

59.   Further, it is immaterial that a spouse was without knowledge or fault with respect to the wrongful conduct. *Id.*

60.   Section 522(o) of the Bankruptcy Code, in pertinent part, states as follows:

> [T]he value of an interest in real or personal property that the debtor . . . uses as a residence . . . or . . . claims as a homestead shall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10–year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt . . . if on such date the debtor had held the property so disposed of.

11 U.S.C. § 522(o) (2010).

61.   "[T]o prevail under § 522(o), four elements must be proven: (1) the debtor disposed of property within ten years preceding the bankruptcy filing; (2) the disposed property was non-exempt; (3) some or all of the proceeds from the disposition of this nonexempt property were used to buy a new homestead, to improve an existing homestead, or reduce the debt associated with an existing homestead; and (4) the debtor disposed of the nonexempt property with the intent to hinder, delay, or defraud a creditor. *In re Cowin*, 2014 WL 1168714, at *14 (Bankr. S.D. Tex., Mar. 21, 2014) (citing *In re Sissom,* 366 B.R. 677, 688 (Bankr. S.D. Tex. 2007)).

62.   To prevail under § 522(o), the objecting party bears the burden of proving these four elements by a preponderance of the evidence. FED. R. BANKR.P. 4003(c); *Cipolla v. Roberts (In re Cipolla),* 476 F. App'x. 301, 305 (5th Cir. 2012).

63.   The Plaintiff failed to establish any entitlement to the relief available pursuant to 11 U.S.C. § 522(o).

*Fiduciary Relationships Under Texas Law*

64.   The term "fiduciary" refers to a person owing a duty of integrity and fidelity. *Kinzbach Tool Co. v. Corbett–Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 512 (1942).

65.   "Generally speaking, it applies to any person who occupies a position of peculiar confidence towards another. It refers to integrity and fidelity. It contemplates fair dealing and good faith, rather than legal obligation, as the basis of the transaction." *Id.*

66.   There are two general categories of fiduciary relationships recognized under Texas law.

67.   One category is a formal fiduciary relationship that arises as a matter of law, and includes relationships between attorney and client, principal and agent, partners, and joint venturers. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002).

68.   There is no evidence of a formal fiduciary relationship existing between Sonia and Stephen with regard to the financial management of Sonia's cash assets.

69.   A second category under which a fiduciary capacity is recognized under Texas law is an informal fiduciary relationship or a "confidential relationship" that may arise from moral, social, domestic, or personal relationships in which one person trusts in and relies on another. *Meyer v. Cathey*, 167 S.W.3d 327, 330-31 (Tex. 2005); *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 176-77 (Tex. 1997).

70.   "An informal fiduciary relationship exists where, because of family relationship or otherwise, one party is in fact accustomed to be guided by the judgment or advice of the other." *Lee v. Hasson*, 286 S.W.3d 1, 14 (Tex. App. – Houston [14th Dist.] 2007, pet. denied) (citing *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962)).

71.   Such a relationship "exists where a special confidence is placed in another who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one placing confidence." *American Med. Intern., Inc. v. Giurintano,* 821 S.W.2d 331, 339 (Tex. App.– Houston [14th Dist.] 1991, no writ).

72.   Accordingly, "a fiduciary relationship is an extraordinary one and will not be

lightly created; the mere fact that one subjectively trusts another does not, alone, indicate that he placed confidence in another in the sense demanded by fiduciary relationships because something apart from the transaction between the parties is required." *Giurintano*, 821 S.W.2d at 339; *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App. – Houston [14th Dist.] 1997, pet. denied).

73. "Similarly, family relationships, although a factor in determining whether a fiduciary duty exists, are not enough *alone* to establish a fiduciary relationship." *Kilpatrick v. Kilpatrick*, 2013 WL 3874767 at *4 (Tex. App. – Fort Worth, July 25, 2013, pet. denied) (emphasis added) and "[m]ere subjective trust does not transform an arm's-length transaction into a fiduciary relationship." *Ins Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998).

74. Because not every relationship involving a high degree of trust and confidence triggers a formal fiduciary relationship, "[t]he law recognizes the existence of confidential relationships in those cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *Crim Truck & Tractor Co. v. Navistar Int'l*, 823 S.W.2d 591, 594 (Tex.1992) (*citing Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex.1980)) [acceptance by nephew of status of joint tenant with right of survivorship from aunt created informal fiduciary relationship].

75. "The effect of imposing a fiduciary duty is to require the fiduciary party to place someone else's interests above its own." *Lindley v. McKnight*, 349 S.W.3d 113, 124 (Tex. App.– Fort Worth 2011, no pet.).

76. The circumstances giving rise to an informal fiduciary relationship "are not subject to hard and fast lines." *Moore*, 595 S.W.2d at 508.

77. Accordingly, whether an informal fiduciary relationship exists is "determined from the actualities of the relationship between the persons involved." *Young v. Fawcett*, 376 S.W.3d 209, 214 (Tex. App. – Beaumont 2012, no pet.) (quoting *Thigpen*, 363 S.W.2d at 253); *see also Gregan v. Kelly*, 355 S.W.3d 223, 228 (Tex. App. – Houston [1st Dist.], 2011, no pet.) [finding that the "overarching consideration" in determining the existence of an informal fiduciary relationship is "the nature of the relationship between the parties"].

78. "[I]n order to establish the existence of an informal fiduciary relationship, the record must show that one of the parties relied on the other for moral, financial, or personal support or guidance." *Hasson,* 286 S.W.3d at 14-15 (citing *Trostle v.*

*Trostle*, 77 S.W.3d 908, 915 (Tex. App. – Amarillo 2002, no pet.)).

79.    It has been recognized that "family relationships —  where a person trusts in and relies upon a close member of her core family unit — may give rise to a fiduciary duty." *Young*, 376 S.W.3d at 214 (referencing the mother-son fiduciary relationship in *Mills v Gray*, 147 Tex. 33, 210 S.W.2d 985, 986-89 (1948)).

80.    Other factors which are helpful in determining the existence of an informal fiduciary relationship, particularly in a family relationship, include a plaintiff's advanced age and poor health, as well as evidence of a plaintiff's justified degree of trust in a defendant. *See, e.g.*, *Gray v. Sangrey*, 428 S.W.3d 311, 316 (Tex. App. – Texarkana 2014, pet. denied) and cases cited therein.

81.    When the issues are disputed, the determination of whether an informal fiduciary relationship existed between particular persons is a question of fact. *Areda v. S-W Transp., Inc.*, 365 S.W.3d 838, 841 (Tex. App. – Dallas 2012, no pet.); *Lundy v. Masson*, 260 S.W.3d 482, 502 (Tex. App. – Houston [14th Dist.] 2008, no pet.).

82.    As has been recognized,

> A fiduciary owes a duty to manage any funds entrusted to the fiduciary with utmost honesty and for the principal's best interest.  A fiduciary has no right to make merchandise of the confidence reposed in him.  A fiduciary owes his principal loyalty and good faith; integrity of the strictest kind; fair, honest dealing; and the duty not to conceal matters which might influence his actions to his principal's prejudice.

*Marshall v. Youngblood (In re Youngblood)*, 2009 WL 1232103, at *9 (Bankr. S.D. Tex., Apr. 29, 2009) (internal quotations and citations omitted).

83.    In Texas, it is "the accepted rule that once a fiduciary or confidential relationship is established, a presumption arises that a gift from the principal to the fiduciary is unfair and invalid." *Moore*, 595 S.W.2d at 507.

84.    Under Texas law, "when a fiduciary transacts with the principal or accepts a gift or bequest from the principal, a burden is placed upon the fiduciary to demonstrate the fairness of the transaction." *Gray,* 428 S.W.3d at 317-18.

85.    As has recently been stated,

> All transactions between a fiduciary and her principal are presumptively fraudulent and void; therefore, the burden lies on the fiduciary to establish the validity of any particular transaction in which she is involved.  Moreover, where a fiduciary relationship exists, the burden is on the fiduciary to show that she acted fairly and informed the principal of all material facts relating to the alleged transaction. Even in the case of a gift between parties with a fiduciary relationship, equity indulges the presumption of unfairness and invalidity, and requires proof at the hand of the party claiming validity of the transaction that it is fair and reasonable.  In establishing the fairness of a transaction involving a fiduciary, some of the most important factors are (1) whether there was full disclosure regarding the transaction, (2) whether the consideration, if any, was adequate, and (3) whether the beneficiary had the benefit of independent advice.

*Jordan v. Lyles*, 455 S.W.3d 785, 792 (Tex. App. — Tyler 2015, no pet. h.) (citations omitted).  *See also Young*, 376 S.W.3d at 216.

86.   "To succeed on a claim of breach of fiduciary duty, the plaintiff must show that a fiduciary relationship existed between the plaintiff and defendant, that the defendant breached his fiduciary duty, and that the defendant's breach caused injury to the plaintiff or a benefit to the defendant."  *Meaux Surface Protection, Inc. v. Fogleman,* 607 F.3d 161, 169 (5th Cir. 2010); *accord, Mims-Brown v. Brown,* 428 S.W.3d 366, 374 (Tex. App.– Dallas 2014, no pet.)*; Jones v. Blume,* 196 S.W.3d 440, 447 (Tex. App.– Dallas 2006, pet. denied).

87.   Even if there is a breach of a fiduciary duty, formal or informal, under Texas law, which would otherwise entitle a party to recovery of compensatory damages, the burden of proof still rests on a plaintiff in a dischargeability proceeding to demonstrate the existence of the requisite elements of 11 U.S.C. § 523(a)(4).

*Fiduciary Theft*

88.   As for ownership of monies in a joint account, a "joint account agreement which authorizes funds to be paid to or withdrawn by one party allows the party to insist that the depository honor a request for payment but does not establish the right of that party to the funds against other claimants."  *Stauffer v. Henderson,* 801 S.W.2d 858, 861 (Tex.1990).

89.  It "is not at all unusual for a person to deposit his or her funds into an account upon which another person is authorized to draw merely for the convenience of the depositor." *Id.* In such situations, the "owner of the money intends only to facilitate disbursement of the funds for his or her own purposes, not to transfer title to the co-signator on the account." *Id.*

90.  "From this, we conclude that a party to a joint account is entitled to lawfully draw monies from the account. That authority alone, however, does not establish the party's ownership of the funds. Nor does it alone divest title to the funds from the actual owner." *Hicks v. State*, 419 S.W.3d 555, 558-59 (Tex. App. – Amarillo 2013, pet. denied).

91.  The "[c]reation of a joint account does not . . . necessarily create ownership in the co-signator on the account." *Bailey v. State,* 2003 WL 22860220, at *5–6 (Tex. App.– Austin, Dec. 4, 2003, pet. ref'd).

92.  "When a fiduciary acts in a manner inconsistent with his lawful authority, for the purpose of permanently depriving the owner of property, then he has committed theft." *Harrell v. State*, 834 S.W.2d 540, 543 (Tex. App.– Houston [14th Dist.] 1992, pet. ref'd); *Bailey,* 2003 WL 22860220, at *6.

*Texas Theft Liability Act*

93.  Under the Texas Theft Liability Act ("TTLA"), "a person who commits theft is liable [civilly] for the damages resulting from the theft." 6 Tex. Prac. & Rem. Code §134.003(a) (Vernon 2011). *See generally*, *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366 (Tex. App.– Dallas 2009, pet. denied).

94.  Theft is defined as "unlawfully appropriating property or unlawfully obtaining services as described by sections 31.03–31.07, or 31.11–31.14 of the Texas Penal Code." 6 Tex. Prac. & Rem. Code §134.002(2) (Vernon Supp. 2014).

95.  Section 31.03(a) of the Texas Penal Code provides that a person "commits an offense if he unlawfully appropriates[65] property with intent to deprive[66] the owner

---

[65]  A person "appropriates" property when he "bring[s] about a transfer or purported transfer of title or other non-possessory interest in property, whether to the actor or another, or acquire[s] or otherwise exercise control over property other than real property. 4 Tex. Penal Code §31.01(4) (Vernon

**Page 46 of 62**

of property."  4 TEX. PENAL CODE §31.03(a) (Vernon Supp. 2014).

96.   The element of intent for these purposes can be inferred from the surrounding circumstances.  *Powers v. Caremark, Inc. (In re Powers)*, 261 F. App'x 719, 722 (5th Cir. 2008).

97.   However, the intent to deprive must exist at the time of the taking. *Id.*; *Countrywide Home Loans, Inc. v. Cowin (In re Cowin)*, 492 B.R. 858, 896 (Bankr. S.D. Tex. 2013).

98.   "Appropriation of property is unlawful if it is without the owner's effective consent." 4 TEX. PENAL CODE §31.03(b)(1) (Vernon Supp. 2014).

99.   "[A]n electronic transfer between bank accounts is an appropriation of property for the purposes of [Penal Code] §31.01."  *Compass Bank v. Villarreal*, 2011 WL 1740270, at *14 (S.D. Tex., May 5, 2011) (citing *Coats v. State*, 712 S.W.2d 520, 523 (Tex. Crim. App. 1986)).

100.  In a fiduciary context, "when [a fiduciary] decides, for whatever reason, to unlawfully and permanently deprive the lawful owner of the property, he is then acting in an unauthorized capacity . . . . In  short, at that moment in time he has breached the trust that his [principal] placed in him, and has in turn committed the offense of theft."  *Freeman v. State*, 707 S.W.2d 597, 605-06 (Tex. Crim. App. 1986).

101.  To recover in this context for a civil theft under the TTLA, a plaintiff must establish:  (1) the plaintiff had a possessory right to property; (2) the defendant unlawfully appropriated property in violation of the theft provisions of the Texas Penal Code; and (3) the plaintiff sustained damages as a result of the theft. *Wellogix, Inc. v. Accenture, LLP*, 788 F.Supp.2d 523, 542 (S.D. Tex. 2011).

102.  Notwithstanding the fact the TTLA incorporates the definition of a theft from the Texas Penal Code, a plaintiff seeking recovery under the statute must prove the

---

Supp. 2014).

[66]  To "deprive" another of property includes any action "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner" or "to dispose of property in a manner that makes recovery of the property by the owner unlikely."  4 TEX. PENAL CODE §31.01(2)(A) and (C) (Vernon Supp. 2014).

elements only by a preponderance of the evidence.  *Powers*, 261 F. App'x at 721.

103.   A person who has sustained damages resulting from theft may recover actual damages, additional statutory damages of up to $1,000, court costs and reasonable attorneys' fees under this civil liability statute.  6 TEX. PRAC. & REM. CODE §134.005 (Vernon 2011); *TXCO Res., Inc. v. Peregrine Petroleum, LLC (In re TXCO Res., Inc.)* 475 B.R. 781, 834 (Bankr. W.D. Tex. 2012).

104.   The award of $1,000.00 statutory damages is contingent upon an award of actual damages. *Jones v. Texas Dept. of Criminal Justice*,  2009 WL 2645028, at *2 (Tex. App.– Corpus Christi 2009, no pet.).  "Actual damages," within the meaning of the Act, are those recoverable at common law. *Beaumont v. Basham,*  205 S.W.3d 608, 619 (Tex. App.– Waco 2006, pet. denied).

105.   As an unlawful appropriation of funds for personal use with a fraudulent intent, a civil theft under the TTLA constitutes embezzlement. *Powers,* 261 F. App'x at 722; *Andra Group, L.P. v. Gamble-Ledbetter (In re Gamble- Ledbetter)*, 419 B.R. 682, 696 (Bankr. E.D. Tex. 2009).


*Unjust Enrichment, Constructive Trusts, and Equitable Liens*

106.   "Unjust enrichment is an equitable principle holding that one who receives benefits unjustly should make restitution for those benefits." *Hern Family Ltd. P'ship v. Compass Bank*, 2012 WL 1029533, at *10 (S.D. Tex., Mar. 26, 2012) (citing *Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App.– San Antonio 2004, pet. denied)).

107.   "Unjust enrichment occurs when the person sought to be charged has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain." *Id.*

108.   "A person is unjustly enriched when he obtains a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex.1992).

109.   "Unjust enrichment characterizes the result or failure to make restitution of benefits received under such circumstances as to give rise to an implied or quasi-contract to repay.  It has also been said that recovery under unjust enrichment is an equitable right and is not dependent on the existence of a wrong." *Tex. Conveyor Sys.,* 300 S.W.3d at 367 (*citing Villarreal*, 136 S.W.3d at 270.)).

110.  "A constructive trust is an equitable, court-created remedy designed to prevent unjust enrichment." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015) (*citing Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex.1974)).

111.  Section 55 of the Restatement (Third) of Restitution and Unjust Enrichment provides:

>     If a defendant is unjustly enriched by the acquisition of title to identifiable property at the expense of the claimant or in violation of the claimant's rights, the defendant may be declared a constructive trustee, for the benefit of the claimant, of the property in question and its traceable product.

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 55 (2011).

112.  Thus, when the legal title to property has been obtained through means that render it unconscionable for the holder of legal title to retain the beneficial interest, equity imposes a constructive trust on the property in favor of the one who is equitably entitled to the same. *Fitz–Gerald v. Hull*, 150 Tex. 39, 237 S.W.2d 256, 262–63 (1951).

113.  The theory underlying the constructive-trust remedy is the equitable notion that the "acquisition or retention of the property is wrongful and that [the possessor of the property] would be unjustly enriched if [the possessor] were permitted to retain the property." *KCM Fin.,* 457 S.W.3d at 88.

114.  "A constructive trust is justified when one party commits fraud **or** ... breaches a fiduciary relationship." *Hsin-Chi-Su v. Vantage Drilling Co.*, 2015 WL 4249265, at *11 (Tex. App. – Houston [14th Dist.] July 14, 2015, no pet.) (emphasis in original)(citing *Baker Botts, L.L.P. v. Cailloux,* 224 S.W.3d 723, 736 (Tex. App.– San Antonio 2007, pet. denied)).

115.  Three elements are generally required for a constructive trust to be imposed under Texas law.

116.  The party requesting a constructive trust must establish the following: (1) breach of a special trust or fiduciary relationship or actual or constructive fraud; (2) unjust enrichment of the wrongdoer; and (3) an identifiable res that can be traced back to the original property. *Id.* at 87 (citing *Matter of Haber Oil Co., Inc.,* 12 F.3d 426, 437 (5th Cir.1994)).

117.   "There is no unyielding formula to which a court of equity is bound in decreeing a constructive trust, because the equity of the transaction will necessarily shape the measure of the relief granted. *Hamblet v. Coveney*, 714 S.W.2d 126, 132 (Tex. App – Houston [1st Dist.] 1986, writ ref'd n.r.e.)(citing *Meadows).*

118.   "A court of equity, in decreeing the establishment of the trust, may direct the manner of enforcement of the trust by impressing an equitable charge or *lien* upon the property, rather than effecting a division of the property in kind." *Hamblet*, 714 S.W.2d at 132 (emphasis in original)(citing *Bush v. Gaffney,* 84 S.W.2d 759 (Tex. Civ. App.– San Antonio 1935, no writ)).

119.   "An equitable lien is sometimes described as a subspecies of constructive trust: whereas constructive trust transfers actual ownership of specific property from the holder of legal title to a person with a superior claim, an equitable lien subjects the holder's property to a security interest in favor of the claimant. The liability secured is an underlying money judgment for unjust enrichment, express or implied." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 56 cmt. a (2011).

120.   "An equitable lien is not an estate in the thing to which it attaches, but merely an encumbrance against the property to satisfy a debt." *FNFS, Ltd. v. Harwood (In re Harwood)*, 404 B.R. 366, 400 n. 68 (Bankr. E.D. Tex. 2009) (citing *Karigan v. Karigan*, 239 S.W.2d 436, 439 (Tex. App. – Dallas 2007, no pet.)).

121.   Thus, while both may serve to remedy unjust enrichment, "[t]he difference is that restitution is measured differently"—"[w]here the constructive trust gives a complete title to the plaintiff, the equitable lien only gives him a security interest in the property." *Rawlings v. Rawlings*, __ P.3d __, 2015 WL 5575222, at *7 (Utah 2015) (citing DAN B. DOBBS, LAW OF REMEDIES § 4.3(3) (2d ed.1993)).

*Nondischargeability under § 523(a)(4)*:  *Debt Arising From Fraud or Defalcation in a Fiduciary Capacity*.

122.   The Plaintiff's Complaint seeks a determination that the debt owed to her as determined by the Court should be excepted from discharge under §523(a)(4).

123.   11 U.S.C. §523(a)(4) provides that "A discharge under 11 U.S.C.§ 727 does not discharge an individual from a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny."

124.    The Fifth Circuit has noted "that this discharge exception was intended to reach
        those debts incurred through abuses of fiduciary positions and through active
        misconduct whereby a debtor has deprived others of their property by criminal
        acts; both classes of conduct involve debts arising from the debtor's acquisition or
        use of property that is not the debtor's." *Miller v. J.D. Abrams Inc. (Matter of
        Miller),* 156 F.3d 598, 602 (5th Cir.1998), *cert. denied,* 526 U.S. 1016 (1999)
        (internal quotations omitted).

125.    Whether the actions of an individual were taken in a fiduciary capacity for the
        purposes of §523(a)(4) is determined by federal law.  *Harwood ,* 637 F.3d at 620.

126.    However, "state law is important in determining whether or not a trust obligation
        exists."  *Gupta v. Eastern Idaho Tumor Institute, Inc. (In re Gupta)*, 394 F.3d 347,
        350 (5th Cir. 2004).

127.    The Fifth Circuit has discussed the concept of a fiduciary under §523(a)(4) in the
        following terms:

        [T]he concept of fiduciary under §523(a)(4) is narrower than
        it is under general common law.  Under §523(a)(4),
        "fiduciary" is limited to instances involving express or
        technical trusts.  The purported trustee's duties must,
        therefore, arise independent of any contractual obligation.
        The trustee's obligations, moreover, must have been imposed
        prior to, rather than by virtue of, any claimed
        misappropriation or wrong.  Constructive trusts or trusts *ex
        malificio* thus also fall short of the requirements of
        §523(a)(4).

        . . . Statutory trusts, by contrast, can satisfy the dictates of
        §523(a)(4).  It is not enough, however, that a statute purports
        to create a trust:  A state cannot magically transform ordinary
        agents, contractors, or sellers into fiduciaries by the simple
        incantation of the terms "trust" or "fiduciary."  Rather, to
        meet the requirements of §523(a)(4), a statutory trust must (1)
        include a definable res and (2) impose "trust-like" duties.

        *Texas Lottery Comm'n v. Tran (In re Tran),* 151 F.3d 339, 342-43 (5th Cir. 1998).

**Page 51 of  62**

128.    However, the trust relationship must exist prior to the creation of, and without reference to, the indebtedness in question.  *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1338 (5th Cir. 1980).

129.    The Fifth Circuit has recognized that the "technical" or "express" trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law.  *Harwood*, 404 B.R. at 393 (citing *LSP Inv. Partnership v. Bennett (In re Bennett)*, 898 F.2d 779, 784-85 (5th Cir.), *cert. denied*, 510 U.S. 1011 (1993)).

130.    Thus, federal courts in this context have "not hesitated to conclude that debts arising from misappropriation by persons serving in a traditional, pre-existing fiduciary capacity, as understood by state law principles, are non-dischargeable." *Gupta*, 394 F.3d at 350.

131.    Accordingly, notwithstanding the "technical" or "express" trust requirement, "state law may create a fiduciary relationship whose breach leads to nondischargeability under §523(a)(4)."  *Shcolnik v. Rapid Settlements, Ltd. (In re Shcolnik)*, 670 F.3d 624, 628 (5th Cir. 2012).

132.    The informal fiduciary relationship recognized under Texas law is not an after-the-fact equitable remedy imposed to rectify an earlier wrong.  It is a recognition of an existing relationship which is independent of a particular wrong and which, due to the circumstances of its creation, demands that self-interest yield to a higher standard of conduct.[67]

133.    The informal fiduciary relationship is recognized under Texas law on the basis of an existing relationship of trust and confidence that predates any transaction conducted in its light.

134.    The informal fiduciary relationship is recognized under Texas law only when the actualities of the relationship between the parties evidence that existing relationship.

---

[67]    It would certainly be true, however, that if such an existing relationship is breached, then equitable remedies such as a constructive trust may be brought to bear in order to provide proper redress. *Omohundro v. Matthews,* 161 Tex. 367, 341 S.W.2d 401, 404–05 (1960); *Young,* 376 S.W.3d at 216.

135. The "extraordinary" and stringent circumstances which must be present in order for an informal fiduciary relationship to be recognized under Texas law are more than sufficient to place an actor on effective notice that he/she must place someone else's interests above his/her own.

136. Those "extraordinary" and stringent circumstances which must be present in order for an informal fiduciary relationship to be recognized under Texas law are more than sufficient to place an actor on effective notice that another person, with whom the actor has a confidential relationship, is justified in expecting that the actor will forego self-interest and instead act in the other person's best interests.

137. In such circumstances, the party assuming the fiduciary duty cannot legitimately ignore his duty to observe the high standard of loyalty and care imposed under those circumstances, particularly when arising in a relationship within a core family unit that is characterized by a significant disparity in the knowledge and skill of the participants and a recognition that the less knowledgeable person is yielding to the knowledge, skill, and expertise of the other.

138. This recognition is particularly compelled when the less knowledgeable person is peculiarly vulnerable due to advanced age, poor health, or other disadvantages. *Kirkpatrick v. Cusick*, 2013 WL 6730049, at *6-7 (Tex. App. – Corpus Christi, Dec. 19, 2013, pet. denied); *Kilpatrick*, 2013 WL 3874767 at *4; *Trostle*, 77 S.W.3d at 915; *Estate of Bartlett v. Vaccaro (In re Vaccaro)*, 2010 WL 4053914, at *3 (Bankr. N.D. Ill., Oct. 14, 2010).

139. Because of the stringent circumstances which must be present in order for an informal fiduciary relationship to be recognized under Texas law, that trust-type obligation imposed pursuant to Texas common law is sufficient to meet the technical trust requirement under 11 U.S.C. § 523(a)(4).

140. In regard to all of his actions utilizing his access to, and his management of, Sonia's financial assets, Stephen acted in a fiduciary capacity as to Sonia for the purposes of §523(a)(4).

141. Under Texas law, "where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) *(citing Kinzbach.*, 160 S.W.2d at 514).

142. To establish a claim against a person for knowing participation in a breach of fiduciary duty, a plaintiff must demonstrate: (1) the existence of a fiduciary

relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship. *Id.* (*citing Kinzbach* and *Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 721-22 (Tex. App. – Austin 2001, pet. denied)).

143.   The Plaintiff failed to establish by a preponderance of the evidence that Defendant, Kimberly Ann Douglass, knowingly participated in a breach of fiduciary duty.

144.   The Plaintiff failed to establish by a preponderance of the evidence that any debt owed by Defendant, Kimberly Ann Douglass, to the Plaintiff, Sonia I. Douglass, arose from fraud or defalcation while acting in a fiduciary capacity pursuant to 11 U.S.C. §523(a)(4).

*Defalcation*

145.   The United States Supreme Court has recently rejected an objective recklessness standard in favor of a heightened culpability standard for defalcation in this context.

146.   In a unanimous decision in *Bullock v. BankChampaign, N.A.*, ___ U.S. ___, 133 S.Ct. 1754, 185 L.Ed.2d 922 (2013), the Supreme Court declared that "defalcation" for the purposes of §523(a)(4) "includes a culpable state of mind requirement" involving "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Id.* at 1757.

147.   According to *Bullock*, "where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term [defalcation] requires an intentional wrong." *Id.* at 1759.

148.   Such an "intentional wrong" encompasses not only conduct which the fiduciary knows is improper, but it also encompasses reckless conduct, such as when a fiduciary "consciously disregards (or is willfully blind to) a substantial and unjustifiable risk" that his conduct will result in a breach of fiduciary duty. *Id.*

149.   In seeking to require a higher degree of fault for finding of a defalcation, similar to its "statutory neighbors" of fraud, embezzlement and larceny listed in §523(a)(4), but without imposing an actual requirement of specific intent to establish a defalcation, the Supreme Court adopted a standard of recklessness "of the kind set

forth in the Model Penal Code §2.02(2)(c)."[68]

150.    Acknowledging that its adoption of this heightened level of culpability for defalcation cases under §523(a)(4) had been recognized earlier in bankruptcy jurisprudence from the First and Second Circuit,[69] the Court further noted with approval that this "severe recklessness" standard tracks the showing required to demonstrate scienter in federal securities cases.[70]

151.    Utilizing the MPC definition of recklessness and analyzing the defalcation standard to scienter determinations in federal securities cases is an effort to exclude the type of recklessness arising as a consequence of mere negligence or inadvertence.

152.    As recognized in securities law cases in the Fifth Circuit, this type of "severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involved not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present danger of misleading buyers or sellers [of securities] which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002).

153.    Thus, such a heightened culpability requirement will ensure that the "harsh sanction of nondischargeability is reserved for those who exhibits some portion of misconduct." *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 68-69 (2nd Cir. 2007).

---

[68]    Model Penal Code §2.02(2)(c) states that:

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and justifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

MODEL PENAL CODE § 2.02(2)c) (Thomson Reuters, Westlaw through 2012).

[69]    *See, e.g.*, *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9 (1st Cir. 2002); *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 69 (2nd Cir. 2007).

[70]    Scienter, in the context of securities fraud, is "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976).

154.   At the very least, Stephen consciously disregarded a substantial and unjustifiable risk that each action which he elected to take with regard to Sonia's funds without her prior knowledge or consent would result in a breach of his fiduciary duty to Sonia.

155.   Each of Stephen's unauthorized transfers from Sonia's accounts in breach of his fiduciary duties to her constituted a defalcation by Stephen while acting in a fiduciary capacity for the purposes of §523(a)(4).

156.   Thus, the debt owed by the Defendant, Stephen Charles Douglass, to the Plaintiff, Sonia I. Douglass, as established herein, is therefore excepted from discharge in its entirety as a debt arising from a defalcation while acting in a fiduciary capacity pursuant to 11 U.S.C. §523(a)(4).

157.   The Plaintiff failed to establish by a preponderance of the evidence that any debt owed by Defendant, Kimberly Ann Douglass, to the Plaintiff, Sonia I. Douglass, arose from fraud or defalcation while acting in a fiduciary capacity pursuant to 11 U.S.C. §523(a)(4).

*Nondischargeability under § 523(a)(4)*:  *Debt Arising From Embezzlement.*

158.   "Embezzlement is defined for the purposes of §523(a)(4) as the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Miller,* 156 F.3d at 602.

159.   "Embezzlement, however, is not limited to situations in which one person is entrusted with the property of another.  It also applies where . . . a person lawfully obtains property, but then fraudulently appropriates it for his or her own use." *Powers,* 261 Fed. App'x. at 723.

160.   "Both larceny and embezzlement involve the fraudulent appropriation of property; they differ only in timing.  Larceny applies when a debtor unlawfully appropriates property at the outset, whereas embezzlement applies when a debtor unlawfully appropriates property after it has been entrusted to the Debtor's care." *Rainey v. Davenport (In re Davenport),* 353 B.R. 150, 199 (Bankr. S.D. Tex. 2006).

161.   "Given that a debtor has lawful control of the property, embezzlement then requires three elements: (1) appropriation of funds by the debtor; (2) for the

**Page 56 of  62**

debtor's use or benefit; and (3) with fraudulent intent." *Andra Group, L.P. v. Gamble-Ledbetter (In re Gamble-Ledbetter)*, 419 B.R. 682, 696 (Bankr. E.D. Tex. 2009) *(citing Rainey*, 353 B.R. at 200).

162. Fraudulent intent is "an intent to deceive another person and thereby induce such other person to transfer, alter or terminate a right with respect to property." *Holdaway*, 388 B.R. at 778; *Soisson v. Hillebrandt (In re Hillebrandt)*, 2011 WL 2447738 at \*20 (Bankr. S.D. Miss., June 15, 2011).

163. "Fraudulent intent may be inferred from the conduct of the Debtor and from circumstances of the situation." *Chizk v. Ramon (In re Ramon)*, 433 B.R. 571, 582 (Bankr. N.D. Tex. 2010).

164. Further, any liability for civil theft under the Texas Theft Liability Act establishes embezzlement or larceny for the purposes of §523(a)(4) and is thereby rendered nondischargeable. *Wolbe v. Wheeler (In re Wheeler)*, 2003 WL 23742551, at \*3 (Bankr. N.D. Tex., Dec. 16, 2003) ["A violation of the Texas Theft Liability Act establishes embezzlement or larceny for purposes of §523(a)(4)"].

165. Each of Stephen's unauthorized transfers from Sonia's accounts constituted an embezzlement for the purposes of §523(a)(4).

166. Thus, the debt owed by the Defendant, Stephen Charles Douglass, to the Plaintiff, Sonia I. Douglass, as established herein, is therefore excepted from discharge in its entirety as a debt arising from embezzlement pursuant to 11 U.S.C. §523(a)(4).

167. The Plaintiff failed to establish by a preponderance of the evidence that any debt owed by Defendant, Kimberly Ann Douglass, to the Plaintiff, Sonia I. Douglass, arose from embezzlement pursuant to 11 U.S.C. §523(a)(4).

*Exemplary Damages*

168. The Plaintiff requests an award of exemplary damages. Since the Bankruptcy Code has no section governing exemplary damages, bankruptcy courts look to state law for guidance. *See generally, Smith v. Lounsbury (In re Amberjack Interests, Inc.)*, 326 B.R. 379, 391-92 (Bankr. S.D. Tex. 2005).

169. Thus, the Court looks to Chapter 41 of the Texas Civil Practices and Remedies Code. Specifically, §41.003 of that chapter provides that exemplary damages *may*

be awarded if there is clear and convincing evidence that the harm caused by the defendant arose from fraud, malice, or gross negligence.[71]

170.   A defendant's intentional breach of fiduciary duty is a tort for which a plaintiff may recover exemplary damages under Texas law.  *Moore*, 595 S.W.2d at 510; *In re Estate of Preston*, 346 S.W.3d 137, 170 (Tex. App. – Fort Worth 2011, no pet.) (citing *Lesikar v. Rappeport*, 33 S.W.3d 282, 311 (Tex. App. – Texarkana 2000, pet. denied)); *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 292 (5th Cir. 2007) (applying Texas law).

171.   The repeated breaches of fiduciary duty committed by Stephen, and the resulting damages to Sonia, creates a *per se* showing of "malice," defined in Chapter 41 as "a specific intent by the defendant to cause substantial injury or harm to the claimant."[72]

172.   In light of the purpose of exemplary damages as expressed in §41.001, the factors outlined for the determination of the amount of exemplary damages in §41.011,[73] and limitations imposed thereon by the statute,[74] this Court awards exemplary

---

[71]   2C TEX. CIV. PRAC. & REM. CODE ANN. §41.003(a) (Vernon 2015).  Of course, a fact-finder is always free to decline to award exemplary damages, as such an award is within the discretion of the fact-finder.  2C TEX. CIV. PRAC. & REM. CODE ANN. §41.010(b) (Vernon 2015).

[72]   2C TEX. CIV. PRAC. & REM. CODE ANN. §41.001(7) (Vernon 2015).

[73]   2C TEX. CIV. PRAC. & REM. CODE ANN. §41.011(a) (Vernon 2015) provides as follows:

In determining the amount of exemplary damages, the trier of fact shall consider evidence, if any, relating to:
> (1) the nature of the wrong;
> (2) the character of the conduct involved;
> (3) the degree of culpability of the wrongdoer;
> (4) the situation and sensibilities of the parties involved;
> (5) the extent to which such conduct offends a public sense of justice and propriety; and
> (6) the net worth of the defendant.

[74]   2C TEX. CIV. PRAC. & REM. CODE ANN. §41.008 (Vernon 2015).  The amount of economic damages upon which an award of exemplary damages must be based must exclude any awards of attorneys' fees, *Wheelways Ins. Co. v. Hodges*, 872 S.W.2d 776, 783 n.8 (Tex. App. – Texarkana 1994, no pet. h.) [holding that attorney's fees are not part of actual tort damages upon which statutory exemplary damages cap may be calculated], nor can pre-judgment interest be recovered on any award of exemplary damages.  2C TEX. CIV. PRAC. & REM. CODE ANN. §41.007 (Vernon 2015).

damages in favor of Sonia and against Stephen in the amount of $20,000.00.

173.   "When the primary debt is nondischargeable due to fraud or defalcation while acting in a fiduciary capacity, or as a result of willful and malicious conduct, the related ancillary awards (such as attorneys' fees, interest, and exemplary damages) will also be nondischargeable." *Edelman*, 2014 WL 1796217, at *43 (citing *Cohen v. de la Cruz,* 523 U.S. 213, 215 (1998); *S&S Food Corp. v. Sherali (In re Sherali)*, 490 B.R. 104, 121-22 (Bankr. N.D. Tex. 2013) ["Where, as here, a fiduciary gains a benefit by breaching his fiduciary duty, willful and fraudulent acts may be presumed. An intentional breach may be found where the fiduciary intends to gain an additional benefit for himself."].

*Pre-Judgment Interest and Attorney's Fees*

174.   "Prejudgment interest is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 528 (Tex.1998) (quoting *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 552 (Tex.1985)).

175.   There are two legal sources for an award of prejudgment interest: (1) general principles of equity and (2) an enabling statute. *Id.*

176.   The rationale for this approach as articulated by the Supreme Court of Texas is that a plaintiff is not otherwise fully compensated by the amount of damages sustained at the time of the wrong because he has "been denied the opportunity to invest and earn interest on the amount of damages between the time of the occurrence and the time of judgment." *Cavnar,* 696 S.W.2d at 552.

177.   Thus, under Texas law, whether entitlement to prejudgment interest is derived from statute or, as in this case, equity, "prejudgment interest accrues at the rate for postjudgment interest and [is] computed as simple interest." *Arete Partners, L.P. v. Gunnerman*, 643 F.3d 410, 415 (5th Cir. 2011) (quoting *Johnson & Higgins,* 962 S.W.2d at 532.

178.   The Plaintiff's entitlement to an award of pre-judgment interest, as requested by her complaint and as authorized by state law, is not altered by its inadvertent omission from the pre-trial order. *Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 172 (5th Cir. 2010).

**Page 59 of  62**

179. "Federal Rule of Civil Procedure 54(c) requires that such be included where appropriate." *Id. See also*, *Rathborne Land Co., L.L.C. v. Ascent Energy, Inc.*, 610 F.3d 249, 262 (5th Cir. 2010).

180. Under Texas law, pre-judgment interest accrues on the $41,600.00 actual damage award at the rate of 5% per annum. *Johnson & Higgins,* 962 S.W.2d at 531-32; *Arete Partners, L.P. v. Gunnerman*, 643 F.3d 410, 413 (5th Cir. 2011).

181. In the absence of proof of any written notice of the claim issued by the Plaintiff to the Defendants, accrual of pre-judgment interest on actual damages shall begin on the date of the filing of the petition in the state court lawsuit by and among these parties — January 20, 2012.

182. Thus, the Plaintiff is entitled to a recovery of pre-judgment interest from Stephen through October 22, 2015, in the amount of $7,818.52.

183. As for attorneys' fees, the Plaintiff's request for a recovery of attorneys' fees must be denied.

184. "As a general rule, a party seeking to recover attorneys' fees [under Texas law] carries the burden of proof. Although courts should consider several factors when awarding attorneys' fees, a short hand version of these considerations is that the trial court may award those fees that are "reasonable and necessary" for the prosecution of the suit." *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex.1991).

185. The failure of the Plaintiff to present actual evidence of the attorney's fees incurred, and to demonstrate the reasonable and necessary nature of such fees, precludes the recovery of attorney's fees under the Texas Theft Liability Act or any other applicable authority.

186. With regard to the nondischargeability of interest and attorney's fees awarded to a plaintiff, "the status of ancillary obligations such as attorney's fees and interest depends on that of the primary debt. When the primary debt is nondischargeable . . . , the attorney's fees and interest accompanying compensatory damages, including post-judgment interest, are likewise nondischargeable." *Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195, 1208 (5th Cir. 1996); see also *Cohen ,* 523 U.S. at 218.

*Award of Judgment*

187.   The Plaintiff, Sonia I. Douglass, is entitled to recover from Defendant, Stephen Charles Douglass, actual damages in the amount of $41,600.00 arising from the breaches of fiduciary duty and civil theft committed by Defendant, Stephen Charles Douglass, and to prevent the unjust enrichment of said Defendant arising from his unauthorized actions.

188.   The Plaintiff, Sonia I. Douglass, is further entitled to recover from Defendant, Stephen Charles Douglass, an award of prejudgment interest in the amount of $7,818.52.

189.   The Plaintiff, Sonia I. Douglass, is further entitled to recover from Defendant, Stephen Charles Douglass, the sum of $1,000.00 as statutory damages under the Texas Theft Liability Act.  6 TEX. PRAC. & REM. CODE §134.005 (Vernon 2011).

190.   The Plaintiff, Sonia I. Douglass, is further entitled to recover from Defendant, Stephen Charles Douglass, exemplary damages in the amount of $20,000.00.

191.   The Plaintiff, Sonia I. Douglass, is further entitled to recover from Defendant, Stephen Charles Douglass, court costs in the amount of $293.00. 28 U.S.C. §1920; 6 TEX. PRAC. & REM. CODE §134.005(b) (Vernon 2011).

192.   The Plaintiff, Sonia I. Douglass, is further entitled to recover from Defendant, Stephen Charles Douglass, post-judgment interest on the total judgment amount at the current federal post-judgment interest rate of 0.23% which shall accrue from the date of judgment until paid.  28 U.S.C. §1961.

193.   The entirety of the indebtedness owed by Defendant, Stephen Charles Douglass, to the Plaintiff, Sonia I. Douglass, is declared to be nondischargeable pursuant to 11 U.S.C. §523(a)(4) as a debt arising from fraud or defalcation while acting in a fiduciary capacity and as a debt arising from embezzlement.

194.   To prevent unjust enrichment, an equitable lien in favor of the Plaintiff, Sonia I. Douglass, is imposed upon the 2011 Honda Pilot automobile owned by the Defendants, Stephen Charles Douglass and Kimberly Ann Douglass, to secure the recovery of the $21,500 wrongfully taken from the Plaintiff by Stephen Douglass to purchase that automobile.

195.   Such equitable lien imposed in favor of the Plaintiff, Sonia I. Douglass, upon the

**Page 61 of  62**

2011 Honda Pilot automobile is superior to any exemption right claimed by the Defendants, Stephen Charles Douglass and Kimberly Ann Douglass, pursuant to Chapter 42 of the Texas Property Code.

196.   Because the Court concludes that the Plaintiff has otherwise failed to prove by a preponderance of the evidence that any debt owed by Defendant, Kimberly Ann Douglass, to the Plaintiff, Sonia I. Douglass, arose from fraud or defalcation while acting in a fiduciary capacity or by embezzlement, judgment must be rendered for Defendant Kimberly Ann Douglass under §523(a)(4).

197.   All other relief requested in the Plaintiff's Complaint in the above referenced adversary proceeding shall be denied.

198.   The Plaintiff's First Amended Objection to Debtors' Exemptions is granted in part and denied in part, such that any exemption claim of the Defendant-Debtors, Stephen Charles Douglass and Kimberly Ann Douglass, as to the 2011 Honda Pilot automobile pursuant to Chapter 42 of the Texas Property Code is subordinated to the equitable lien granted to the Plaintiff, Sonia I. Douglass, to secure the recovery of the $21,500 wrongfully diverted from her account by Stephen Douglass.

199.   All other relief sought by the Plaintiff's First Amended Objection to Debtors' Exemptions is denied.

200.   To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

201.   An appropriate judgment shall be entered in this adversary proceeding and an appropriate order pertaining to the First Amended Objection to Exemptions shall be entered in the underlying bankruptcy case, all in a manner consistent with these findings and conclusions.

Signed on 10/23/2015

THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE